[No. C012562. Third Dist. Mar. 30, 1994.]

TAHOE KEYS PROPERTY OWNERS' ASSOCIATION, Plaintiff and Appellant, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents.

1460

1462

1464

**COUNSEL**

Feldman, Shaw, DeVore, Lewis S. Feldman and Deborah A. Palmer for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens and Walter Wunderlich, Assistant Attorneys General, and Daniel L. Siegel, Deputy Attorney General, for Defendants and Respondents.

OPINION

**SPARKS, Acting P. J.**—The plaintiff Tahoe Keys Property Owners' Association (TKPOA) brought an action against defendants State Water Resources Control Board, State of California Regional Water Quality Control Board—Lahonton Region (Lahonton), and State of California Resources Agency (Resources Agency),[1] seeking various forms of relief based upon its contention that a mitigation fee charged as a condition for obtaining building permits is unlawful. TKPOA unsuccessfully sought a preliminary injunction which would have precluded the defendants from collecting further mitigation fees and would have prevented them from making expenditures from the fund created by those fees which were previously collected. TKPOA appeals from the denial of its request for a preliminary injunction. We shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In this appeal we do not have before us a fully developed factual record for two reasons. First, this is an appeal from the denial of a request for a preliminary injunction. ■ A preliminary injunction is a provisional remedy and, except in unusual circumstances, a request for a preliminary injunction would not support a final determination on the merits. (See *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 357 [176 Cal.Rptr. 620].) Accordingly, a request for a preliminary injunction does not contemplate a full trial on the merits. (*Ibid.*) Second, TKPOA is convinced that the decision of the United States Supreme Court in *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] compels a decision in its favor and has thus approached this case as though it could be resolved as a question of law. As we shall explain, this case is not controlled by *Nollan* and on the record presented we find no error in the denial of TKPOA's request for preliminary injunctive relief.

Only a brief factual recitation drawn from the parties' submissions, including the verified complaint, is necessary. The area known as the Tahoe Keys consists of 26 subdivisions bordering on Lake Tahoe. The Tahoe Keys is a waterfront development which was created by extensive dredge and fill

---

[1] The official actions of which TKPOA complains were taken, in part, by the California Tahoe Regional Planning Agency (CTRPA). CTRPA has been statutorily deactivated and the secretary of the Resources Agency has been designated as successor of CTRPA for litigation purposes. (Gov. Code, § 67132.) Defendants point out that the secretary of the Resources Agency rather than the agency should have been the named defendant, but they do not object to consideration of the issues on this ground. Since we are concerned here with a land-use regulation imposed by CTRPA, we will refer to CTRPA in the body of this opinion, although it is the secretary of the Resources Agency who now represents those state interests.

operations in what was formerly the Truckee Marsh. The development consists of individual lots on "arms of land" raised above the lake level by fill operations and surrounded by lagoons that meander through the development so as to give each lot owner access to the lagoons and through the lagoons to the lake. TKPOA is an owners association representing 1,594 members who own property within the Tahoe Keys and that holds title to the common areas in the Tahoe Keys.

The Tahoe Keys development commenced in the spring of 1959 and continued during the 1960's. In 1970 the developer conveyed its interest in the common areas to TKPOA, and in a resolution Lahonton has stated that the modifications to the former stream environment zone (SEZ) were accomplished prior to 1972.

The Tahoe Basin is a unique natural environment.[2] "However, there is good reason to fear that the region's natural wealth contains the virus of its ultimate impoverishment." (*People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 485 [96 Cal.Rptr. 553, 487 P.2d 1193].) By the late 1960's California, Nevada and the federal government were becoming increasingly aware of the degradation which was being and would be wrought by uncontrolled development of the region. In 1968 California and Nevada entered into the Tahoe Regional Planning Compact to regulate development. (See Gov. Code, §§ 66800-66801; Nev. Rev. Stat. §§ 277.190-277.230 (1973).) Congress gave its consent to the compact in 1969. (*Lake Country Estates* v. *Tahoe Planning Agcy., supra,* 440 U.S. at p. 394 [59 L.Ed.2d at p. 406].) The Tahoe Regional Planning Compact created the Tahoe Regional Planning Agency (TRPA). (*Ibid.*) At the same time our Legislature created the California Tahoe Regional Planning Agency (CTRPA) to attempt to maintain an equilibrium between the region's natural endowment and its manmade environment. (Gov. Code, § 67002.) In creating CTRPA the Legislature provided for its deactivation upon the adoption by TRPA of ordinances, rules and regulations which met the requirements of the regional compact. (Gov. Code, § 67131; *California Tahoe Regional Planning Agency* v. *Day & Night Electric, Inc.* (1985) 163 Cal.App.3d 898, 906 [210 Cal.Rptr. 48].)

Virtually contemporaneous with rising concerns over the degradation of the Tahoe Basin and the creation of TRPA and CTRPA, our Legislature

---

[2]Lake Tahoe is renowned for its clarity and it has been said that only two other sizable lakes in the world are of comparable clarity—Crater Lake in Oregon and Lake Baikal in what was formerly the Soviet Union. (See *Lake Country Estates* v. *Tahoe Planning Agcy.* (1979) 440 U.S. 391, 393, fn. 2 [59 L.Ed.2d 401, 405, 99 S.Ct. 1171].) Only Lake Tahoe, because it is not protected as part of a national park and is readily accessible from large metropolitan centers, is so vulnerable to excessive urban development. (*Ibid.*)

enacted a comprehensive revision of our water quality control laws in order to provide for a statewide program for the control of the quality of all of the waters of the state. (Stats. 1969, ch. 482, p. 1045; see Gov. Code, § 13000.) The core of this new legislation was the Porter-Cologne Water Quality Control Act. (Wat. Code, § 13020 et seq.; see generally, Robie, *Water Pollution: An Affirmative Response by the California Legislature* (1970) 1 Pacific L.J. 2.) The new legislation retained from prior law the concept of enforcement of water quality objectives through nine regional boards, but gave the regional boards and the State Water Resources Control Board greater powers and duties to implement water quality policies. (See Robie, *supra*, 1 Pacific L.J. at p. 4.) Each regional board was required to formulate and adopt water quality control plans for all areas within its region, subject to approval by the state board. (Wat. Code, §§ 13240, 13245.) Lahonton is the regional board with jurisdiction over the Tahoe Basin. (Wat. Code, § 13200, subd. (h).)

In the early 1980's, at a time when structures had been built upon roughly two-thirds of the lots in the Tahoe Keys, both CTRPA and Lahonton classified the area as a stream environment zone under their respective regulations.[3] Such a classification would effectively preclude owners from obtaining development permits to construct dwellings on their vacant lots. TKPOA, on behalf of its members, asked CTRPA and Lahonton to reclassify the Tahoe Keys to a classification which would enable individual lot owners to obtain building permits. The record on appeal does not include the records of the administrative proceedings which led up to the reclassification of the Tahoe Keys by CTRPA and Lahonton. It does appear, however, that there were extensive scientific studies, negotiations, and hearings conducted by and between CTRPA, Lahonton and TKPOA before reclassification of the Tahoe Keys in 1982.

In 1982, by resolution No. 82-8, Lahonton reclassified the Tahoe Keys as a man-modified stream environment zone. The resolution contains factual findings in support of the reclassification. Included among Lahonton's determinations were findings that the modification of the upper Truckee Marsh resulted in significant reduction of the natural water treatment capacity of the zone and that substantial deterioration of Lake Tahoe had resulted, and that the construction and continuing operation and maintenance of the Tahoe Keys lagoons and peninsulas contributes significant quantities of nutrients to the waters of Lake Tahoe. The resolution imposes requirements for the buildout of the area. The requirement with which we are concerned here is

[3]TKPOA states that the Tahoe Keys was designed to accommodate 335 townhouse units and 1,249 single-family residences. By 1981, before the actions at issue here, all of the townhouses and approximately 800 of the residences had been constructed.

that a mitigation fee of $4,000 be paid for each lot to be developed. The fees thus collected were to be used to establish a mitigation fund which would be used, with the participation of TKPOA, to accomplish projects designed to achieve a net reduction of nutrients entering Lake Tahoe equivalent to that generated by the Tahoe Keys development.

Also in 1982, by resolution No. 82-10, CTRPA reclassified the Tahoe Keys as a substantially altered stream environment zone. The CTRPA resolution included factual findings similar to the Lahonton resolution. CTRPA also imposed a $4,000 per lot mitigation fee on further construction.[4] The CTRPA resolution refers to a memorandum of understanding (MOU) that had been prepared to set forth the mitigation package proposed by TKPOA, which would include the requirement of a $4,000 mitigation fee.[5] It states that the mitigation fund thus established would be used to achieve a net reduction of nutrients equivalent to that generated by the Tahoe Keys and that priority would be given to on-site (within the Tahoe Keys) mitigation measures.

From the time of the Lahonton and CTRPA resolutions in 1982 until February 1991, TKPOA did not protest the imposition of mitigation fees and individual lot owners who obtained building permits paid their fees into the mitigation fund. During that time approximately 300 residences were constructed and, with interest, the mitigation fund grew to approximately $1.5 million.

By letter dated February 15, 1991, TKPOA objected to the past and future imposition of the mitigation fee. It demanded that the mitigation fees which had been collected be refunded and that no such fee be imposed on future construction. Lahonton rejected TKPOA's demand by resolution No. 6-91-47. TKPOA commenced this action in June 1991.[6] TKPOA seeks to preclude CTPRA and Lahonton from collecting further mitigation fees and to

---

[4]The mitigation fee imposed by CTRPA is not in addition to the fee imposed by Lahonton; rather, it is the same fee. It also appears that the fee includes a $750 fee imposed by TRPA. No issue is presented here with respect to any portion of the fee required by TRPA.

[5]TKPOA attached a copy of the MOU to its complaint. The MOU recites that it is an agreement between TKPOA, CTRPA, and Lahonton. The CTRPA resolution by which the Tahoe Keys was reclassified refers to the MOU. The Lahonton resolution does not refer to the MOU, but does reflect that TKPOA was to be an active participant in determining how the mitigation fund would be used. TKPOA asserts that the MOU was never formally executed by Lahonton.

[6]TKPOA states that following Lahonton's rejection of its demand it commenced a proceeding for administrative review by the State Water Resources Control Board pursuant to Water Code section 13320, subdivision (a). TKPOA concedes that it has not exhausted that remedy. However, citing *National Audobon Society* v. *Superior Court* (1983) 33 Cal.3d 419, at pages

require them to pay over to TKPOA the mitigation fund established from the fees previously collected.

TKPOA sought preliminary injunctive relief to restrain CTRPA and Lahonton from collecting any further mitigation fees and from making any expenditures from the mitigation fund pending trial.[7] The trial court denied the request for preliminary injunctive relief and TKPOA appeals.

## DISCUSSION

■ "The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court." (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].) The party challenging an order granting or denying a preliminary injunction has the burden of making a clear showing of an abuse of discretion. (*Ibid.*) An abuse of discretion will be found only where the trial court's decision exceeds the bounds of reason or contravenes the uncontradicted evidence. (*Ibid.*)

■ In determining whether or not to issue a preliminary injunction, a trial court must evaluate two interrelated factors. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm the plaintiff may suffer if the injunction is denied as compared to the

450-451 [189 Cal.Rptr. 346, 658 P.2d 709], TKPOA asserts that the courts have concurrent jurisdiction over water issues. TKPOA asked the trial court to exercise its jurisdiction and to restrain further administrative proceedings pending resolution of the litigation. *National Audubon Society* is not squarely on point, since that case was concerned with water rights rather than water quality under the Porter-Cologne Water Quality Control Act. However, the defendants have not complained that TKPOA has failed to exhaust its administrative remedies and in view of our conclusion in this appeal that is not a question we must consider.

[7]TKPOA asserts that no expenditure was made from the mitigation fund until this litigation was commenced, at which time Lahonton began to take action on proposed expenditures. Although it appears uncontroverted that no expenditure had been made before this litigation, it does not appear that Lahonton engaged in a sudden rush to spend the fund in light of the litigation. In fact, for several years the parties, with the active participation of TKPOA, had been engaged in negotiations, studies, and workshops with respect to proposed mitigation projects. One project proposed by TKPOA had become the focus of the discussions. That project involved the circulation of Tahoe Keys water to the Pope Marsh as a means of filtering the water before it entered Lake Tahoe. The proposal required the participation and approval of the United States Forest Service, which suggested an initial pilot project to test the efficacy of the proposal before a decision on full implementation. Shortly after this litigation commenced Lahonton was scheduled to consider funding the pilot project from the mitigation fund. However, the project required the participation of TKPOA and in light of its demand for repayment of the mitigation fund it informed Lahonton that it would not participate if the pilot project would be funded through the mitigation fund. That effectively prevented implementation of the pilot project and it does not appear that approval of any other expenditure from the fund was imminent.

harm that the defendant may suffer if the injunction is granted. (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 69-70.) In thus balancing the respective equities of the parties, the court must determine whether, pending a trial on the merits, the defendant should or should not be restrained from exercising the right claimed by it. (*Ibid.*)

TKPOA sets forth several legal theories upon which it believes it is entitled to relief. While these legal theories require separate consideration with respect to the likelihood that TKPOA will prevail on the merits, the harm which TKPOA may suffer if provisional relief is denied is a factor which is common to the propriety of preliminary injunctive relief under every theory. ██ Accordingly, before individually addressing the potential merits of TKPOA's theories, we will first address TKPOA's claim of interim harm by denial of preliminary injunctive relief.

██ The showing of potential harm that a plaintiff must make in support of a request for preliminary injunctive relief may be expressed in various linguistic formulations, such as the inadequacy of legal remedies or the threat of irreparable injury (compare Civ. Code, § 3422 with Code Civ. Proc., § 526),[8] but whatever the choice of words it is clear that a plaintiff must make some showing which would support the exercise of the rather extraordinary power to restrain the defendant's actions prior to a trial on the merits. (See *Jessen* v. *Keystone Savings & Loan Assn.* (1983) 142 Cal.App.3d 454, 459 [191 Cal.Rptr. 104]; *Voorhies* v. *Greene* (1983) 139 Cal.App.3d 989, 997 [189 Cal.Rptr. 132]; *Schwartz* v. *Arata* (1920) 45 Cal.App. 596, 601 [188 P. 313].) In general, if the plaintiff may be fully compensated by the payment of damages in the event he prevails, then preliminary injunctive relief should be denied. (*Ibid.*) Where, as here, the defendants are public agencies and the plaintiff seeks to restrain them in the performance of their duties, public policy considerations also come into play. There is a general rule against enjoining public officers or agencies from performing their duties. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 401 [128 Cal.Rptr. 183, 546 P.2d 687]; *Golden Gate S. T., Inc.* v. *San Francisco* (1937) 21 Cal.App.2d 582, 584-585 [69 P.2d 899].) This rule would not preclude a court from enjoining unconstitutional or void acts, but to support a request for such relief the plaintiff must make a significant showing of irreparable injury. (*Ibid.*)

██ TKPOA presented little evidence or argument that would support a claim of irreparable injury in the event of the denial of provisional relief.

---

[8]The Civil Code refers to inadequacy of legal remedies rather than irreparable injury, but the Civil Code provisions with respect to injunctive relief govern only final injunctions and not preliminary injunctions. (Civ. Code, § 3421.) The Code of Civil Procedure, which governs both final and provisional relief, refers to irreparable injury. (Code Civ. Proc., § 526.)

There was no evidence to suggest that if defendants continue to collect the mitigation fee individual lot owners would be precluded from building upon or otherwise utilizing their property.[9] In the event TKPOA should prevail legal damages will be readily ascertainable and there was no evidence to suggest that if TKPOA prevails individual lot owners cannot be fully compensated by payment of those damages. In asserting the right to provisional relief TKPOA argued, essentially, that the fee is unconstitutional and if defendants are permitted to collect it pending trial then individual lot owners will be compelled to suffer, at least temporarily, the payment of an unconstitutional fee. To the extent this assertion involves the likelihood that TKPOA will prevail on the merits we will discuss it in a subsequent portion of this opinion. At this point, we will not presume irremediable injury or the inadequacy of legal remedies based simply on assertion of a constitutional theory for relief.

With respect to expenditures from the mitigation fund, TKPOA's showing was even more scant. The mitigation fund was established by the payment of fees by individual lot owners who built on their lots in the nine years between defendants' reclassification of the Tahoe Keys and TKPOA's objection to the fees. Repayment through the assessment of damages, the legal remedy, is the only relief that can be accorded those persons and an order enjoining expenditures from the mitigation fund will neither ameliorate their damages nor hasten their recovery. TKPOA's attempt to establish the potential of harm from a denial of provisional relief was based upon the assertion that in light of the state's budget difficulties it would appear that the state could not respond in damages if TKPOA prevails. We, like the trial court, find that assertion to be entitled to short shrift. Although it is common knowledge that the state has suffered through budgetary difficulties in the last several years (see *Department of Personnel Administration* v. *Superior Court* (1992) 5 Cal.App.4th 155, 163 [6 Cal.Rptr.2d 714]), the entire Tahoe Keys mitigation fund amounts to much less than .00003 percent of the state's annual general fund budget and there is no reason to believe that the state would be unable to reimburse any expenditures from the mitigation fund in the event it should be judicially determined that it must do so.

On the other side of the scale we consider the potential harm to defendants if a preliminary injunction is granted. Where, as here, the plaintiff seeks to

---

[9]TKPOA presented the declaration of Gregory A. Bennallack, an owner of an unimproved parcel within Tahoe Keys. He believes the mitigation fee is unconstitutional and unfair. He asserted the obvious, that if defendants are allowed to continue collecting the fee he will be unable to build upon his land without paying the fee. He did not suggest that continued collection of the fee would prevent or dissuade him from building upon his land and said nothing which would suggest that he could not be fully compensated by repayment of the fee in the event TKPOA prevails.

enjoin public officers and agencies in the performance of their duties the public interest must be considered. (*Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582, 588 [39 Cal.Rptr. 708, 394 P.2d 548]; *Cota* v. *County of Los Angeles* (1980) 105 Cal.App.3d 282, 292 [164 Cal.Rptr. 323].) In this instance the defendants are attempting to perform their legal duties to preserve or at least mitigate the degradation of Lake Tahoe and its environs caused by development. That is a matter of significant public concern and provisional injunctive relief which would deter or delay defendants in the performance of their duties would necessarily entail a significant risk of harm to the public interest. If defendants are enjoined from making expenditures from the mitigation fund pending trial on the merits then they may very well delay or forgo mitigation projects with resulting harm to the public interest.[10]

With respect to TKPOA's request for an injunction against further collection of mitigation fees from individual lot owners, we find significant potential harm to defendants. TKPOA is acting in a representative capacity in seeking to restrain defendants from collecting mitigation fees from individual lot owners pending trial on the merits. No individual lot owner is a party to this action. Accordingly, if the defendants are provisionally restrained but ultimately prevail, the trial court will lack the ability to recompense defendants for the fees they will have been precluded from collecting in the interim. In that event the defendants will be relegated to the potentially expensive and time-consuming necessity of bringing multiple collection actions against individual lot owners in an effort to recoup their damages. This is a compelling reason for denial of TKPOA's request for provisional relief against the collection of mitigation fees from individual lot owners. (See *Santa Cruz F. B. Assn.* v. *Grant* (1894) 104 Cal. 306, 308 [37 P. 1034].)

Based upon these factors we find little risk of irreparable harm to TKPOA if provisional relief is denied and significant risk of harm to defendants if such relief is granted.

The next step in our analysis must be consideration of TKPOA's specific theories for relief and the likelihood that it will prevail on the merits. We turn now to those theories.

---

[10]Even in the absence of a provisional injunction the litigation itself is likely to have a chilling effect on defendants' use of the mitigation fund, since they will have to make their decisions with an awareness that if TKPOA prevails the mitigation fund will have to be repaid. However, that is a matter the defendants will have to consider in the exercise of their administrative discretion; it is a different matter to assert that they should be judicially enjoined from exercising that discretion.

### 1. *Nollan* v. *California Coastal Comm'n.*

 TKPOA asserts that the decision in *Nollan* v. *California Coastal Comm'n, supra,* 483 U.S. 825 is dispositive and compels the conclusion that the mitigation fee involved here is unconstitutional. We disagree.

In *Nollan,* the plaintiffs were the owners of a beach-front lot on which a small, dilapidated bungalow stood. They desired to demolish the bungalow and replace it with a three-bedroom house consistent with the neighborhood. The Coastal Commission agreed to issue a building permit provided the plaintiffs would agree to record a lateral public easement across the beach-front portion of their property.[11] On review the United States Supreme Court noted that the right to exclude others is an essential attribute of private property and concluded that governmental action which vests outsiders with the permanent and continuous right to pass to and fro across a person's land is a taking of private property. (*Nollan* v. *California Coastal Comm'n, supra,* 483 U.S. at pp. 831-832 [97 L.Ed.2d at p. 686].) Since the taking of such an easement outright without compensation would violate the federal Constitution, the question became whether requiring the conveyance of the easement as a condition for issuance of a land-use permit would alter the outcome. (*Id.* at p. 834 [97 L.Ed.2d at p. 687].)

 In addressing the redefined question, the high court made it clear that a physical taking of property as a condition for issuance of a land-use permit will not per se violate the Constitution, but will instead be subjected to heightened scrutiny. (483 U.S. at pp. 836, 841 [97 L.Ed.2d at pp. 689, 692].) In general, if the government could deny a use permit in the furtherance of a legitimate police-power purpose then it may exact a physical taking to serve the same purpose. (*Id.* at p. 836 [97 L.Ed.2d at pp. 688-689].) The government may act to regulate land use to serve a broad range of purposes. (*Id.* at pp. 834-835 [97 L.Ed.2d at pp. 687-688].) But to be valid as a land-use regulation, a condition that results in a physical taking must " 'substantially advance[]' " some legitimate government purpose connected with the project at issue. (*Ibid.*) This requires that the governmental purpose relate to the project at issue, and that there be a nexus between the condition and the governmental purpose. (*Id.* at p. 837 [97 L.Ed.2d at p. 689].) If the condition "utterly fails to further the end advanced as justification" then the condition

---

[11]The public easement sought by the Coastal Commission was "lateral" because it was not an access easement from the public road to the beach, but crossed the back or beach side of the plaintiffs' property from one private property to another.

is not a valid land-use regulation and becomes an unconstitutional taking. (*Ibid.*)[12]

In *Nollan*, the justifications given by the Coastal Commission were essentially specious. Indeed, the Supreme Court found it "impossible to understand" how the condition exacted by the commission furthered the public purposes advanced as justification. (483 U.S. at p. 838 [97 L.Ed.2d at p. 690].)[13]Accordingly, the taking as a condition for the issuance of a land-use permit was invalid. (*Ibid.*)

 TKPOA's assertion that the decision in *Nollan* is dispositive here cannot withstand scrutiny. In *Lucas* v. *So. Carolina Coastal Council* (1992) 505 U.S. ___ [120 L.Ed.2d 798, 112 S.Ct. 2886], the United States Supreme Court noted that the "Takings Clause" reaches beyond a direct appropriation of private property and that while the use of property may be regulated, if the regulation goes too far it will be considered a taking. (505 U.S. at p. ___ [120 L.Ed.2d at p. 812].) In "Takings Clause" jurisprudence, the cases involving alleged regulatory takings fall into three categories: (1) where the owner is compelled to suffer a permanent physical invasion of his property; (2) where the owner is denied all economically beneficial or productive use of the land; and (3) where the owner is subjected to other regulatory restrictions on the use of the property. (*Id.* at pp. ___-___ [120 L.Ed.2d at pp. 812-813].) The first two categories of regulatory actions have been described by the court "as compensable without case-specific inquiry into the public interest advanced in support of the restraint." (*Id.* at p. ___ [120 L.Ed.2d at p. 812].) But most alleged regulatory takings fall into the

---

[12]Governments are vested with the power of eminent domain which enables them to take private property to serve any legitimate public interest, provided that the property owner is compensated for the taking. Accordingly, the mere assertion that a taking serves a public interest is not sufficient to support an uncompensated taking, since the Constitution specifically requires that compensation be paid in such circumstances. While the government may engage in legitimate land-use regulation, it cannot be permitted to use the occasion of an application for a land-use permit as an excuse to extort private property from its owner where the taking would otherwise require compensation. Accordingly, to support an uncompensated taking it must appear both that the public purpose have a relationship to the property or the project at issue and that the taking advances that public purpose rather than some purpose unrelated to the property or the project at issue. (*Ibid.*)

[13]The Coastal Commission asserted that the Nollans' new house would interfere with visual access to the beach, would somehow create a "psychological barrier" to beach use by interfering with the public's desire to use public beaches, and, somewhat inconsistently, would increase the use of public beaches thus creating the need for more beach access. The court accepted visual access as a legitimate public interest but noted that a lateral easement across the back of the Nollans' property could not alleviate that concern. The court appeared incredulous about the other justifications but did not specifically consider whether they were sufficient to constitute a legitimate public interest because a lateral easement could not advance those interests. (*Ibid.*)

third category and in such cases the court has eschewed rigid formulae, preferring instead to engage in ad hoc factual inquiries. (*Ibid.*) In making such inquiries the court will engage in the assumption that through the regulation the state is simply adjusting the benefits and burdens of economic life in an appropriate manner. (*Id.* at p. __ [120 L.Ed.2d at p. 814].) However, as we have noted, in the relatively rare instance in which a case truly falls into one of the first two categories, compensation will be required without case-specific inquiry into the public purpose advanced in support of the regulation. (*Id.* at p. __ [120 L.Ed.2d at p. 812].)[14]

In light of *Lucas* it appears that the first step in a "Takings Clause" analysis is to determine the type of case being considered. In *Lucas*, the regulation at issue forbade the plaintiff from any development of his land and the state court found this regulation deprived him of all economically beneficial or productive use of the land but upheld the restriction because it served a valid state interest. (505 U.S. at p. __ [120 L.Ed.2d at p. 809].) Since the findings of the state court placed *Lucas* squarely into the second category of takings cases, the Supreme Court held that inquiry into the legitimacy of the public purpose could not justify the restriction as a land-use regulation and the matter was remanded for the consideration of other issues. (*Id.* at p. __ [120 L.Ed.2d at pp. 822-823].) In making the remand, however, the high court made it clear that cases of this nature are rare. If any economically beneficial or productive use is left to the landowner then the situation falls into the third rather than the second category. (*Id.* at p. __, especially fn. 8 [120 L.Ed.2d at p. 815].)[15]

In a decision rendered between *Nollan* and *Lucas*, the high court considered the standards for determining whether a case falls into the first category of "Takings Clause" cases, that is, physical takings. In *Yee* v. *Escondido* (1992) 503 U.S. __ [118 L.Ed.2d 153, 112 S.Ct. 1522], the plaintiffs were owners of a mobilehome park who contended that a local mobilehome

---

[14]This does not mean that any governmental action that appears to fall into one of the first two categories is necessarily invalid unless pensation is paid to the property owner. For example, the state may enforce its statutes against public and private nuisances even if doing so deprives an owner of all economic use of the land. (*Id.* at p. __ [120 L.Ed.2d at p. 821].) And the state may assert a public right of way that was a preexisting limitation upon the landowner's title. (*Ibid.*) The question in these instances is whether the use interests asserted by the landowner were part of his title to begin with, that is, whether they were part of the bundle of rights obtained with the title. (*Id.* at p. __ [120 L.Ed.2d at p. 820].)

[15]In the ad hoc factual inquiry required for the third category of cases the extent to which a landowner is restricted in the use of the property is relevant in determining whether the regulation goes too far, but even where almost all of the economically beneficial or productive use of the property is prohibited a case-specific factual inquiry is still required. In short, whether a case falls into the second category is an " 'all-or-nothing' " matter. (*Ibid.*)

ordinance, in conjunction with the state's mobilehome residency law, constituted a physical taking of their property. Together the laws restricted rents and rent increases, prohibited the owner from requiring the removal of a mobilehome when it was sold, prohibited the owner from adjusting the rent or charging a transfer fee upon sale of the mobilehome, and prohibited the owner from disapproving a purchaser who could pay the rent. The plaintiffs argued that the statutes and ordinances constituted a taking of their property by denying them the right to exclude others from their property and by transferring some of the value of the property to mobilehome owner/tenants who would reap the benefit of frozen rents upon selling their mobilehomes. The court rejected the claim that the laws constituted a physical taking, reasoning that (1) there was no compelled physical occupation because the decision to use the property as a mobilehome park in the first instance was voluntary with the owner and, although it would take six to twelve months to do so, the owners could elect to change the use of the land; and (2) virtually all land-use regulation involves a transfer of wealth and a transfer of wealth in itself does not convert regulation into physical invasion. (*Id.* at pp. ___ [118 L.Ed.2d at pp. 165-166].)

The decision in *Nollan* must be considered in light of *Yee* and *Lucas*. When we do so we perceive that the analysis in *Nollan* was actually directed to determining whether it would fall into the first or the third category of "Takings Clause" cases, that is, whether or not it was a physical taking case. There the Coastal Commission attempted to avoid the conclusion that a physical taking was involved by asserting that the taking was part of its regulation of land use. However, the court held that where the government accomplishes a permanent physical invasion through its land-use regulations the courts must be "particularly careful" to ensure that the regulations substantially advance a legitimate state interest since there is a heightened risk that the purpose is the avoidance of the compensation requirement rather than the attainment of the stated police power objective. (*Nollan v. California Coastal Comm'n, supra,* 483 U.S. at p. 841 [97 L.Ed.2d at p. 692].) Stated another way, the physical invasion of one's property, including the impairment of the right to exclude others from the property, "will invite exceedingly close scrutiny under the Takings Clause." (*Lucas v. So. Carolina Coastal Council, supra,* 505 U.S. at p. ___, fn. 8 [120 L.Ed.2d at p. 815].) The court assumed arguendo the legitimacy of the public purposes advanced as justification by the state in *Nollan,* but since the condition exacted utterly failed to advance those purposes it was nothing but an uncompensated physical taking.

Unlike *Nollan,* this case falls squarely into the third, catch-all category of "Takings Clause" cases. There has been no physical invasion of

plaintiff's property nor is there any suggestion that landowners have been deprived of all economically beneficial or productive use of the land. This case is not entitled to the heightened scrutiny that a physical taking would entail. Instead, the court will "indulge [in] our usual assumption that the legislature is simply 'adjusting the benefits and burdens of economic life,' [citation] in a manner that secures an 'average reciprocity of advantage' to everyone concerned." (*Lucas* v. *So. Carolina Coastal Council, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 814].) In this type of case, resolution of a challenge to the regulatory measure requires a careful case-specific factual inquiry. In short, the decision in *Nollan* is not dispositive and standing alone that decision does not establish that plaintiff is likely to prevail in this litigation.

### 2. *Regulatory Taking.*

As we have noted above, this case cannot be resolved without a case-specific factual inquiry. (See *Blue Jeans Equities West* v. *City and County of San Francisco* (1992) 3 Cal.App.4th 164, 171 [4 Cal.Rptr.2d 114].) Alleged regulatory takings of this sort "necessarily entail[] complex factual assessments of the purposes and economic effects of government actions." (*Yee* v. *Escondido, supra,* 503 U.S. at p. __ [118 L.Ed.2d at p. 162].) Accordingly, such cases do not lend themselves readily to summary disposition without a fully developed factual record. (*Tahoe Regional Planning Agency* v. *King* (1991) 233 Cal.App.3d 1365, 1401 [285 Cal.Rptr. 335].) Since in this type of case courts will generally assume the propriety of the land-use regulation (*Lucas* v. *So. Carolina Coastal Comm'n, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 814]), it falls upon the plaintiff to establish its invalidity. And, although a request for a preliminary injunction does not contemplate a full trial on the merits, the party seeking the injunction must present sufficient evidentiary facts to establish a likelihood that it will prevail. (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at p. 69; *Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d at p. 357.) In view of TKPOA's erroneous belief that the decision in *Nollan* is dispositive, it did not engage in a full factual development of its challenge to the mitigation fee. We are relegated to determining whether, upon the scant factual record and such facts as we may judicially notice, it appears likely that TKPOA will prevail upon a trial on the merits.

In considering challenges to the validity of land-use regulations of this type, we must initially consider whether the regulation substantially advances a legitimate state interest. (*Agins* v. *Tiburon* (1980) 447 U.S. 255, 260-261 [65 L.Ed.2d 106, 112, 100 S.Ct. 2138].) This is a two-pronged

question. First, it must appear that the government interest set forth as justification for the restriction reasonably relates to the property and/or project in question and second, the restriction must reasonably serve that interest. However, contrary to TKPOA's assertion, it is not necessary that the governmental interest relate solely to the land or project in question, nor is it necessary that the regulation be limited to remedying the specific contribution to the problem that will be attributable to the project in question. (See *Associated Home Builders etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633, 638 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847]; *Ayers* v. *City Council of Los Angeles* (1949) 34 Cal.2d 31, 41 [207 P.2d 1, 11 A.L.R.2d 503].) Rather, it is established that the justification for a restriction is not limited to the needs or burdens created only by the proposed project. (*Remmenga* v. *California Coastal Com.* (1985) 163 Cal.App.3d 623, 628 [209 Cal.Rptr. 628].) The decision in *Nollan* did not cast doubt on this latter point. It specifically stated that the state could consider the effect of the project "alone, or by reason of the cumulative impact produced in conjunction with other construction." (483 U.S. at p. 835 [97 L.Ed.2d at p. 688].) And the decision concluded that the Coastal Commission could have imposed conditions on the Nollans that would have been directed at remedying the cumulative impact of their project and others. (*Id.* at p. 836 [97 L.Ed.2d 689].)[16] The vice in *Nollan* was that the condition imposed utterly failed to further the end advanced as justification and not that it was not confined to the specific effects of the project in question. (*Id.* at p. 837 [97 L.Ed.2d at p. 689].)

The government may constitutionally engage in land-use regulation to serve a broad range of interests. (*Nollan* v. *California Coastal Comm'n, supra,* 483 U.S. at pp. 834-835 [97 L.Ed.2d at p. 688].) The validity of the governmental interest in preserving the unique natural environment of the Tahoe Basin has been recognized by Congress and the Legislatures of California and Nevada, as well as by state and federal courts. (*Lake Country Estates* v. *Tahoe Planning Agcy., supra,* 440 U.S. at pp. 393-394 [59 L.Ed.2d at pp. 405-406]; *People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d at p. 487.) Pollution of Lake Tahoe by virtue of development of the surrounding land is one of the obvious and primary dangers which led to the

---

[16]In *Nollan*, the Coastal Commission asserted, among other things, that the plaintiffs' project in conjunction with prior development would create a visual barrier to the shoreline. The court said that to remedy that problem the commission could have compelled the Nollans to grant a permanent easement for viewing purposes as a condition for issuance of a building permit. The compelled dedication of such a "viewing spot" would obviously have addressed the cumulative impacts of beach-front construction but would have fallen upon the Nollans alone, yet the court saw no constitutional obstacle sufficient to invalidate such a condition without a case-specific factual inquiry.

comprehensive regulation which has occurred. (*People* ex rel. *Younger* v. *County of El Dorado, supra*, 5 Cal.3d at p. 486.) ■ Since the state's justification for the imposition of a mitigation fee upon Tahoe Keys property owners was to ameliorate the effects of pollution from the Tahoe Keys development, there can be no doubt that justification for the regulation at issue here does constitute an important state interest reasonably related to the development and build-out of the Tahoe Keys.

The mitigation fee charged to TKPOA's members was calculated based upon estimates of the quantities of nutrients entering Lake Tahoe as a result of the development and continuing maintenance and operation of the Tahoe Keys subdivisions and lagoons. And the mitigation fund was specifically dedicated to partial mitigation of the effects of that source of pollution through projects to abate or at least offset the polluting effects of the Tahoe Keys. Thus, on the face of the regulation there appears to be a sufficient nexus between the effect of the regulation and the objectives it was supposed to advance to support the regulatory scheme. (See *Yee* v. *Escondido, supra*, 503 U.S. at p. __ [118 L.Ed.2d at p. 167]; *Nollan* v. *California Coastal Comm'n, supra*, 483 U.S. at pp. 834-835 [97 L.Ed.2d at pp. 687-688].)

■ In these circumstances our focus must turn to the question set forth by the United States Supreme Court in this manner: "[W]here the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." (*Yee* v. *Escondido, supra*, 503 U.S. at p. [118 L.Ed.2d at p. 162]; see also *Nollan* v. *California Coastal Comm'n, supra*, 483 U.S. at p. 835, fn. 4 [97 L.Ed.2d at p. 688].)

■ While the public as a whole will doubtlessly benefit generally from the preservation of Lake Tahoe and its environs, we perceive no reason in the record to doubt that landowners in the area, such as TKPOA and its members, will benefit specially. After all, they are not simply transient visitors but plan to live there or at least have a concrete investment in the area. Since preservation of the area will confer benefits upon plaintiff and its members beyond those received by the general public, it is fair that they shoulder more of the burden. (See *White* v. *County of San Diego* (1980) 26 Cal.3d 897, 904 [163 Cal.Rptr. 640, 608 P.2d 728]; *City of Baldwin Park* v. *Stoskus* (1972) 8 Cal.3d 563, 568 [105 Cal.Rptr. 325, 503 P.2d 1333, 59

A.L.R.3d 525].)[17] When coupled with the fact that the government can act to preserve the area only through regulation of landowners such as TKPOA and its members, these special benefits convince us that, without more, the challenged regulation does not unfairly single out plaintiff and its members when compared to the general public.

In its argument TKPOA compares its members to a class that is more limited than the general public, namely, other landowners in the Tahoe Basin. It asserts that the $4,000 mitigation fee applies only to the Tahoe Keys and that its members are thus singled out for payment of the fee. The scope of this argument is too narrow. ▇ Land-use regulations need not apply across the board to everyone arguably concerned. Rather, the government is permitted to adjust the benefits and burdens of economic life in a manner that secures an average reciprocity of advantage. (*Lucas* v. *So. Carolina Coastal Council, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 814].) Land-use regulations often have differing effects on neighboring properties and this fact alone does not invalidate a regulatory scheme. (*Yee* v. *Escondido, supra,* 503 U.S. at p. __ [118 L.Ed.2d at pp. 166-167].) It follows that the fact that the regulatory restrictions imposed on one group are different in kind than the restrictions imposed on others does not in itself establish that the first group has been unfairly singled out to bear the burden of the governmental objective. That question must be answered by reference to such things as danger to the public interest created by the land-use aspirations of the different property owners, the extent of the burdens imposed on the different property owners when compared to the burdens imposed on others, and, where applicable, the nature of any special benefits which will accrue to the different property owners by virtue of the regulatory program.

▇ Governmental efforts to regulate land use in the Tahoe Basin have been of an unusually comprehensive scope, with the basic concept being "to provide for the region as a whole the planning, conservation and resource development essential to accommodate a growing population within the region's relatively small area without destroying the environment." (*People ex rel. Younger* v. *County of El Dorado, supra,* 5 Cal.3d at p. 487.) To accomplish this purpose virtually all landowners within the basin have been required to submit to regulation of their land-use aspirations. Many landowners would consider the restrictions upon their aspirations to be draconian when compared to the payment of a substantial, but hardly confiscatory,

---

[17]The cited cases were concerned with the establishment of special assessment districts under California law. However, the legal standard for determining the validity of a special assessment district and that for determining the validity of a land-use regulation as stated in *Yee, supra,* are strikingly similar and we find special assessment cases persuasive on this question.

mitigation fee. (See *Viso* v. *State of California* (1979) 92 Cal.App.3d 15, 19 [144 Cal.Rptr. 776]; *Sierra Terreno* v. *Tahoe Regional Planning Agency* (1978) 79 Cal.App.3d 439, 443 [144 Cal.Rptr. 776]; *Tahoe-Sierra Preserv.* v. *Tahoe Reg. Planning Agency* (9th Cir. 1990) 911 F.2d 1331, 1333-1334; *People of California* v. *Tahoe Regional Plan Agency* (9th Cir. 1985) 766 F.2d 1308, 1313-1314.) For example, as a result of the severe use restrictions imposed on landowners outside of the Tahoe Keys, many such landowners claim to have suffered significant diminution in the value of their properties, both from an economic expectation perspective and from a market value perspective. (*Viso* v. *State of California, supra,* 92 Cal.App.3d at pp. 20-21 [alleged loss of $4.5 million from the property's value at its highest and best use]; *Sierra-Terreno* v. *Tahoe Regional Planning Agency, supra,* 79 Cal.App.3d at p. 443 [alleged drop in market value to no more than 25 percent of former value]; *Tahoe-Sierra Preserv.* v. *Tahoe Reg. Planning Agency, supra,* 911 F.2d at p. 1333 [claimed loss of all economically feasible uses of the land].)

On the other side of the ledger, we may consider the special benefits which will accrue to the parties. Through comprehensive land-use planning in the Tahoe Basin the natural beauty of the region, and hence of the property of landowners in the basin, may be preserved. However, unlike many landowners, TKPOA's members will not be required to contribute to this end by forgoing their intended use of the land. Since TKPOA's members will be permitted to build residences upon their land, they are in a particularly advantageous position to reap the benefits of the regulatory program. In short, the preservation of the area will preserve the natural beauty that made their property desirable in the first place, that in turn will serve to maintain or enhance the market value of the property, and it is likely that the shortage of similarly situated properties that has been created or enhanced by governmentally enforced use restrictions will exert an upward pressure on market values of the homes in the Tahoe Keys.

When we consider the benefits and burdens of the regulatory program on a basin-wide basis based upon the facts shown in the record and those which we may judicially notice, we cannot conclude that TKPOA has shown a substantial likelihood that it will succeed in establishing that its members have been unfairly singled out to the bear the burden of the governmental efforts to preserve the Tahoe Basin.

TKPOA also compares its members who have or will be required to pay the mitigation fee to members who built earlier and thus were not required to pay the fee. According to this argument the damage to Lake Tahoe from the

Tahoe Keys development was caused by the original developer's dredge and fill operations and the consequent loss of the natural treatment capacity of the Truckee Marsh, most of the individual lot owners in the Tahoe Keys built upon their lots before CTRPA and Lahonton imposed the mitigation fee, and thus the remaining lot owners are forced to pay for all of the damage caused by development from which all lot owners benefited and that was caused by the original developer in any event.

The factual premises of this argument are not established in the record. Although CTRPA and Lahonton cited a loss of natural treatment capacity from the destruction of the Truckee Marsh, in their resolutions both agencies specifically found that continuing operation and maintenance of the Tahoe Keys subdivisions and lagoons contribute significant quantities of nutrients to the waters of Lake Tahoe. A computation of the mitigation fee was an attachment to the Lahonton resolution. Although full explanation of the computation would require testimonial evidence from the parties and probably from experts, on its face the computation appears to refute TKPOA's assertions. Thus, the fee was based upon the total dissolved nitrogen entering the lake as a result of the Tahoe Keys development. Of the 2,920-kilogram total, only 300 kilograms were attributed to lost natural treatment capacity.[18] This was converted to an equivalent suspended sediment load and an equivalent cost of mitigation was determined using the 1981 cost of the last 50 percent of erosion control projects, thus indicating a contributory rather than complete mitigation charge. Of this total, 63 percent was assigned to TKPOA, again indicating a contributory basis for computation of the fee. The resulting sum was used to calculate a per lot mitigation fee for new construction. From this computation we cannot conclude that those lot owners who were or will be required to pay a mitigation fee have been forced to pay for all of the mitigation of all of the pollution entering the lake as a result of the development, nor that the damage they are required to mitigate is entirely, or even largely, attributable to the original developer rather than the continuing operation and maintenance of the Tahoe Keys subdivisions and lagoons.

In any event, a landowner cannot defeat a land-use regulation simply by pointing to someone else who by prior use escaped the regulation, for otherwise there could be no land-use planning. As a general rule, land use regulation must be prospective in nature because the state is constitutionally limited in the extent to which it may, through land use regulation,

---

[18]The figure for lost treatment capacity was "30% of 1000 kg/yr," apparently indicating that only 30 percent of the actual lost treatment capacity was used in the computation. This was added to 2,620 kilograms per year that was "contributed by current Tahoe Keys Development."

affect prior existing uses. (See *HFH Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 516 [125 Cal.Rptr. 365, 542 P.2d 237]; *Orinda Homeowners Committee* v. *Board of Supervisors* (1970) 11 Cal.App.3d 768, 775-776 [90 Cal.Rptr. 88, 43 A.L.R.3d 880].) Accordingly, preexisting use is a constitutional line of demarcation in land-use regulation and prior uses are protected while expectations and aspirations are not. (*Ibid.*) In other words, landowners have no vested right in existing or anticipated zoning regulations. (*Ibid.*) ■ The alleged disparity between those who built before CTRPA and Lahonton commenced their comprehensive regulation of development of the Tahoe Basin and those who built or will build later is a matter which may enter into the complex factual assessment required to determine whether the regulation goes too far, but it does not in itself compel invalidation of the regulation.

In addition to these matters, the defendants properly point out that there is substantial doubt that TKPOA will even be allowed to proceed to the merits of its claim. It is significant that TKPOA engaged in extensive negotiations with CTPRA and Lahonton over the reclassification of the Tahoe Keys; that it proposed a mitigation fee as a condition of reclassification;[19] that it agreed to the conditions imposed in the resolutions, including the mitigation fee; that it did not administratively or judicially challenge the resolutions in a timely manner; and that it accepted the benefits of the resolutions for nine years before making any objection to the mitigation fee. ■ A landowner or his successor in title is barred from challenging a condition imposed in a land-use regulation if he has acquiesced therein by either specifically agreeing to the condition or by failing to challenge its validity while accepting the benefits afforded. (*County of Imperial* v. *McDougal* (1977) 19 Cal.3d 505, 510-511 [138 Cal.Rptr. 472, 564 P.2d 14]; *Edmonds* v. *County of Los Angeles* (1953) 40 Cal.2d 642, 650 [255 P.2d 772]; *J-Marion Co.* v. *County of Sacramento* (1977) 76 Cal.App.3d 517, 523 [142 Cal.Rptr. 723]; *Pfeiffer* v. *City of La Mesa* (1977) 69 Cal.App.3d 74, 78 [137 Cal.Rptr. 804].) ■ TKPOA has pointed to nothing which would indicate that this rule is not fully applicable to it in this instance.[20]

Upon a consideration of the record, including the procedural hurdles TKPOA must overcome before addressing the merits of its claim and its

---

[19]In its initial request to CTPRA and Lahonton for reclassification of the Tahoe Keys, TKPOA proposed the creation of a mitigation fund to support offsite mitigation measures to be funded by the assessment of $1,000 against new construction. Through negotiations the suggestion was altered in some respects, such as the amount of the fee, the manner of it collection, and the establishment of a priority for onsite mitigation projects. However, it does appear that the suggestion that a mitigation fee be imposed originated with TKPOA.

[20]Even if we were to assume that this rule does not serve as a complete bar to TKPOA's claims, it still appears that TKPOA will be precluded from obtaining all of the relief it seeks. For example, it is regarded as fundamental that a landowner who obtains a building permit

preliminary showing upon the merits, we cannot conclude that TKPOA has established a significant likelihood that it will prevail on the merits after a full trial. In view of TKPOA's scant showing that damages are not an adequate remedy, we find no abuse of discretion in the denial of its request for preliminary injunctive relief on its constitutional claims.

### 3. *Non-Constitution-based Claims.*

 TKPOA's claim of irremediable injury in support of its request for preliminary injunctive relief was based primarily on the argument that its constitutional rights are being violated and that damages cannot be deemed an adequate remedy for constitutional violations. With respect to TKPOA's assertion of claims that are not based upon the Constitution, its showing of irremediable injury all but disappears. This is a substantial reason for denying provisional relief, at least in the absence of a strong showing of a substantial likelihood that TKPOA will prevail at trial. We find no such showing here and need only briefly discuss the nonconstitutional theories of relief.

TKPOA asserts that CTRPA should be enjoined from collection and expenditure of the mitigation fee and fund because it failed to obtain Lahonton's execution of the MOU reflecting the parties' agreement. We disagree. In challenging the imposition of the mitigation fee it is the resolution imposing the fee and not the MOU that TKPOA must attack. The CTRPA resolution referred to an MOU that had been prepared to set forth the mitigation package proposed by TKPOA, but neither the resolution nor the fee was made contingent upon execution of the MOU. In any event, if TKPOA believed execution of the MOU was essential that was a matter it could have and should have raised at the time. It cannot now challenge the resolution and fee on this basis. (See *Edmonds* v. *County of Los Angeles, supra,* 40 Cal.2d at p. 653.)

---

and complies with its conditions waives the right to assert the invalidity of the condition and thus TKPOA's members who paid the fee without protest will be precluded from pursuing a claim for refund. (*Pfeiffer* v. *City of La Mesa, supra,* 69 Cal.App.3d at p. 78.) And those members of TKPOA who paid the mitigation fee beyond the applicable statute of limitations will be time-barred from obtaining refunds. It also appears that TKPOA will be precluded from litigating some of the factual issues it asserts. For example, in connection with the request for reclassification CTPRA commissioned scientific studies to evaluate the impact of further development within the Tahoe Keys. TKPOA retained an expert to advise it with respect to the studies. Although TKPOA indicated that it was not in agreement with the results of the studies, it specifically elected not to dispute the studies for purposes of its request for reclassification. That was a waiver of the right to contest the factual basis of the mitigation fee and even if TKPOA is permitted to challenge the reasonableness of the fee it will not be permitted to dispute the factual premise upon which the fee was imposed.

TKPOA asserts that Lahonton should be enjoined from making expenditures from the mitigation fund because it failed to execute the MOU. The Lahonton resolution was not contingent upon execution of the MOU. In fact, it did not refer to the MOU at all, although it did empower its executive officer to enter into any agreements necessary to ensure proper administration of the mitigation fund. As with the CTRPA resolution, if TKPOA believed that execution of the MOU was essential to the reclassification of the Tahoe Keys by Lahonton, that is a matter that could have and should have been raised at the time. (*Edmonds* v. *County of Los Angeles, supra,* 40 Cal.2d at p. 653.)

TKPOA asserts that collection and expenditure of the mitigation fees should be enjoined based upon conflicts between the CTRPA and Lahonton resolutions. We perceive no fatal conflicts. The MOU prepared to reflect TKPOA's proposal stated that it was the intent of parties that the mitigation fund be utilized for on-site mitigation if such mitigation is best effective. The CTPRA resolution said that the fund would be used for on- or off-site mitigation measures, but said that priority would be given to on-site measures. It also provided that expenditure of the fund would be determined jointly between it, TKPOA, and Lahonton. The Lahonton resolution provided for mitigation measures within the Tahoe Basin, but clearly contemplated that approval of projects would be a joint endeavor between it and any other affected agency with the active participation of TKPOA. Under these circumstances expenditures under the CTPRA resolution and expenditures under the Lahonton resolution will not inevitably conflict. In the absence of a concrete proposed off-site project endorsed by Lahonton but rejected by CTRPA and TKPOA, there is no basis for judicial intervention.

TKPOA asserts that unless expenditure of the mitigation fund is enjoined, the defendants may make expenditures in violation of its right to participate in the determination of how the fund should be spent. We have noted that both resolutions contemplated the active participation of TKPOA in the decisionmaking process. On the record it appears that TKPOA did actively participate in discussion and negotiations concerning expenditure of the fund until it adopted the position that the mitigation fee was invalid and began proceedings to challenge the fee. TKPOA's right to participate in the decisionmaking process is satisfied if it is given the opportunity to do so; its refusal to participate as a litigation tactic cannot serve as the basis for enjoining CTRPA and Lahonton in the performance of their legal duties.

DISPOSITION

The order denying TKPOA's request for a preliminary injunction is affirmed.

Sims, J., concurred.

**SCOTLAND, J.**—I concur in the result but write separately because I believe it is unnecessary for this court to consider the question whether plaintiff is likely to prevail on the merits at trial.

In determining whether to grant or deny a request for a preliminary injunction, the trial court must consider the likelihood that the plaintiff will prevail on the merits at trial and must weigh the interim harm to the plaintiff if the injunction is denied against the interim harm to the defendant if the injunction is granted. (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 287 [219 Cal.Rptr. 467, 707 P.2d 840].) Thus, the respective equities of the parties must be balanced to determine whether, pending a trial on the merits, the defendant should or should not be restrained from exercising the right it claims. (*Ibid.*) "When a trial court denies an application for a preliminary injunction, it implicitly determines that the plaintiffs have failed to satisfy either or both of the 'interim harm' and 'likelihood of prevailing on the merits' factors. On appeal, the question becomes whether the trial court abused its discretion in ruling on *both* factors." (*Id.*, at pp. 286-287, italics in original.) "Even if the appellate court finds that the trial court abused its discretion as to one of the factors, *it nevertheless may affirm the trial court's order if it finds no abuse of discretion as to the other.*" (*Id.*, at p. 287, italics added.)

I agree with the majority's conclusion that the record shows little risk of irreparable harm to plaintiff if provisional relief is denied and significant risk of harm to defendants if such relief is granted. Therefore, the trial court did not abuse its discretion in denying the preliminary injunction. (*Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d at pp. 286-287.)

Because the trial court's order may be affirmed on the interim harm analysis alone, I decline to consider whether plaintiff has shown it is likely to prevail at trial on its claim that the mitigation fee charged as a condition for obtaining building permits is unlawful.

Appellant's petition for review by the Supreme Court was denied June 16, 1994.