Filed 12/23/14  Thum v. Bd. of Directors Monterey Water Mgmt Dist. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| RICHARD THUM et al., | H039566 |
| Plaintiffs and Appellants, | (Monterey County Super. Ct. No. M113598) |
| v. | |
| BOARD OF DIRECTORS OF THE MONTEREY PENINSULA WATER MANAGEMENT DISTRICT et al., | |
| Defendants and Respondents. | |

The Monterey Peninsula Water Management District (District or MPWMD) was created through the enactment of the Monterey Peninsula Water Management District Law ("District Law") in 1977.  (Stats. 1977, ch. 527, § 1 et seq., West's Ann. Wat. Appen. (1995) § 118-1 et seq.)[1]  Richard and Sharlene Thum purchased a residential property in 2009 and subsequently completed a bathroom addition for which they had secured a water permit from the District in January 2010.  The District's final inspection of the Thums' property determined that the property was not in compliance with the permit because there were two unauthorized showerheads.  The unauthorized showerheads were not in the new bathroom; they were in other bathrooms.  The Thums unsuccessfully appealed the determination of noncompliance to the District's Board of

---

[1]    All further statutory references are to this uncodified law as reprinted in West's Annotated Water Code Appendix unless otherwise specified.

Directors (Board). Subsequently, they unsuccessfully sought a writ of mandate and declaratory relief from the trial court against respondents District and Board.

The Thums appeal from the trial court's judgment denying a writ of mandate and declaratory relief. They argue that the trial court erred and, on various grounds, challenge the District's rules[2] regulating the addition of residential water fixtures through a water permitting process that requires payment of connection charges. The Thums essentially argue that the determination of permit noncompliance was based upon the application of ordinances and rules that exceeded respondents' statutory authority.

We conclude that the Thums are not entitled to writ relief. The matter must be remanded, however, to allow the trial court to address the Thums' complaint for declaratory relief.

## I

### *Background*

A. *Factual and Procedural Background*

According to their combined amended verified petition for writ of mandate and complaint for declaratory relief, the Thums "primarily reside outside of California" and they "purchased a vacation home in Pebble Beach in 2009." It indicates that the Thums obtained a water permit from the District allowing them to convert a closet to a bathroom and, as part of the water permit process, the Thums were required to consent to a deed restriction and pay a water connection fee.

A notice and deed restriction regarding limitation on use of water on a property ("Deed Restriction"), signed by the Thums and a District representative, was recorded on January 21, 2010. The Deed Restriction states the Thums and the District "agree that the maximum permitted water use at the Subject Property is limited to supply the Potable

---

[2] All further references to rules are to the District's rules.

water requirements for single family dwelling consisting of" enumerated water fixtures, including "1 Standard Bathtub (may have Showerhead above)" and "2 Showers, Separate Stall (One Showerhead)." It expressly provides: "No water use fixtures other than those listed above have been approved or authorized for use on the Subject Property." The Deed Restriction states that the owners "acknowledge[]" "the limitation on the water use fixtures referenced above have been voluntarily accepted as a condition of Water Permit No. 30234" and "this restriction is permanent and irrevocable, unless amended by the filing of a less restrictive deed restriction."

The Deed Restriction states the owners "elect[] and irrevocably covenant[]" with the District to "abide by the conditions of [the Deed Restriction] to enable issuance of Water Permit No. 30234." It further indicates that the Deed Restriction agreement "constitutes a mandatory condition precedent to receipt of regulatory approval" and approval of the permit would have been withheld "[b]ut for the limitations . . . ." It also states the undersigned owners "agree[] with and accept[] all terms of this document . . . ."

The District issued Water Permit No. 30234 on January 26, 2010. The permit specified that the permit involved adding a bathroom and expressly stated in bold, upper case letters: "**FINAL INSPECTION REQUIRED BY MPWMD**." It indicated the number of existing fixtures, including a bathtub with a showerhead and shower stall with one showerhead, and the number of postproject fixtures, which included an additional shower stall with one showerhead. The permit indicated that penalties may be imposed for additional water fixtures installed without amendment of the water permit.

A final inspection report of the Thums' property, dated July 6, 2010, determined the property was not in compliance with Water Permit No. 30234 in that there were two additional shower heads. The District sent an "Immediate Action Required" letter, dated July 9, 2010, to the Thums. The letter stated: "The inspection report represents a final

3

decision of the General Manager and is appealable within 21 days of the date of inspection."

The Thums filed a written application for an administrative appeal on July 29, 2010. Their application indicated that "Cal Am" was the water company that serviced their property, a single family dwelling. In the application, they argued that they "obtained a vested right to add the bathroom without additional fees or other requirements once the District issued permit 30234" and "equitable estoppels bars the District from finding that the Property is in noncompliance with the District's rules" because the District had inspected the property's water fixtures in 2007 in connection with a prior permit and given its final approval, no changes had been made to those fixtures, and the Thums had relied on the District's final approval of the fixtures under the prior permit.

In a supplemental letter, dated March 25, 2011, the Thums' counsel added further legal arguments: (1) the District does not have the statutory authority to restrict household water use, (2) the District does not have the authority to charge connection fees when it has not created a connection to water furnished by it, (3) the District's "permit rules that limit the number and location of water fixtures in a house for the purpose of estimating water use capacity and assessing connection fees constitute a taking in violation of the" United States and California Constitutions, (4) the District's "rules that count and limit the number and location of residential water fixtures violates [*sic*] substantive due process" under the United States and California Constitutions, (5) the District's "imposition of deed restrictions on residential property constitutes an unreasonable restraint on alienation," and (6) the District's "rules that permit inspections of private residential property violate protections from government searches provided by" the United States and California Constitutions, (7) the "District's rules and practice of

entering private residential homes to count water fixtures violate the right of privacy granted under the California Constitution."

The Thums provided a second supplemental letter, dated April 18, 2011, in support of their administrative appeal. They essentially reiterated their arguments that the District made a mistake in counting the fixtures when they inspected the property in 2007 (prior to their purchase of the property), the Thums relied upon the District's water fixture count from 2007, they did not add any fixtures to the other bathrooms, and they should not be penalized for the District's error. They also raised other contentions, including but not limited to the argument that the District's rules were arbitrary and vague.

The General Manager provided a report to the Board for the hearing. Five potential remedies for the permit violation were presented by the report. Two proposals involved paying for a new water permit after either purchasing entitlement water from a private company or seeking water from Monterey County's water allocation. The other proposed remedies were (1) permanent removal of the unauthorized fixtures, (2) offsetting the unauthorized fixtures by installing high efficiency fixtures or appliances to generate a water use credit and removing another water fixture (utility sink), or (3) installing diverters to ensure that only one showerhead operated at a time.

The Board considered the Thums' administrative appeal at a hearing held on April 18, 2011. At the hearing, the Thums' counsel argued that they had obtained a vested right to add the bathroom without additional fees or other requirements once the District issued its permit. The Thums' counsel asserted that equitable estoppel barred the District from finding the property was not compliant with the District's rules because the District was aware of the number of fixtures from a 2007 inspection of the property while the Thums were unaware of how the District counted fixtures and relied on the District's issuance of Water Permit No. 30234. Their counsel argued the deed restriction limiting

5

water fixtures was an unconstitutional taking without just compensation and the District's rules limiting residential water fixtures violated the Thums' substantive due process rights.

On May 16, 2011, the Board approved the adoption of factual findings supporting the denial of the Thums' appeal. Among other facts, the Board found that the District's July 2010 inspection revealed two independently operating showerheads that had not been recorded during its 2007 inspection, both Water Permit No. 30234 and "the fixture-specific deed restriction recorded when the Water Permit was issued list[ed] only single Showerheads in the bathing enclosures," the recorded deed restriction signed by the Thums acknowledged that no water fixtures other than those listed on the document had been approved or authorized, and the District's rule 20 requires a water permit before installing new water fixtures or modifying existing water fixtures. The Board endorsed the proposed options available to the Thums to remedy the two unauthorized showerheads.

B. *General Legal Background*

California's Constitution provides in pertinent part: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. . . . This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained." (Cal. Const., art. X, § 2.)

"Legislation with respect to water affects the public welfare and the right to legislate in regard to its use and conservation is referable to the police power of the state. [Citation.]" (*In re Maas* (1933) 219 Cal. 422, 424.) "The doctrine prohibiting

6

delegations of legislative power is not violated if the Legislature makes the fundamental policy decisions and leaves to some other body, public or private, the task of achieving the goals envisioned in the legislation. (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 375-377 . . . .)" (*People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 507.) " 'It is a well-established rule of law that authority may be delegated by the legislature to administrative boards or officers to adopt reasonable rules and terms to carry out the general purpose for which a statute is enacted, even though the delegated power confers a discretion or the necessity of determining terms, qualifications or facts upon the board or officer within the scope of the legislative act. [Citations.]' " (*Fillmore Union High School Dist. v. Cobb* (1935) 5 Cal.2d 26, 33.) "When exercising its statutory powers, a district's governing board of necessity has considerable discretion to decide what is in the best interest of the population it serves. (See *Wilson v. Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 286-287 . . . .)" (*Building Industry Assn. v. Marin Mun. Water Dist.* (1991) 235 Cal.App.3d 1641, 1648.)

C. *The District Law*

The District Law was enacted in 1977. (Stats. 1977, ch. 527, § 1 et seq., § 118-1 et seq.) In enacting the District Law, the Legislature made express findings, including the finding that "water problems in the Monterey Peninsula area require integrated management." (§ 118-2.) It found and declared that "within the Monterey Peninsula area, there is need for conserving and augmenting the supplies of water by integrated management of ground and surface water supplies, for control and conservation of storm and wastewater, and for promotion of the reuse and reclamation of water" and that "need cannot be effectively met on a piecemeal basis." (*Ibid.*)

The Legislature further found and declared that "within the Monterey Peninsula area which will be served by the public district created by this law, the water service is principally supplied by a privately owned water supplier which does not have the

7

facilities nor the ability to perform functions which are normally performed by public agencies, including the ability to raise sufficient capital for necessary public works, contract with, or provide necessary assurances to, federal and state agencies for financing of water projects and supplying of water, and the regulation of the distribution of water developed within or brought into such service area." (§ 118-2.) It determined that it was "necessary to create a public agency to carry out such functions which only can be effectively performed by government, including, *but not limited to*, management and regulation of the use, reuse, reclamation, conservation of water and bond financing of public works projects." (*Ibid*., italics added.) The Legislature stated: "In order to serve the people of the Monterey Peninsula efficiently, to prevent waste or unreasonable use of water supplies, to promote the control and treatment of storm water and wastewater, and to conserve and foster the scenic values, environmental quality, and native vegetation and fish and wildlife and recreation in the Monterey Peninsula and the Carmel River basin, it is, therefore, hereby declared that a general law cannot be made applicable to such area, and that the enactment of this special law is necessary for the public welfare and for the protection of the environmental quality and the health and property of the residents therein." (*Ibid*.)

As to its powers generally, the District Law expressly authorizes the District to "exercise the powers which are *expressly granted* by this law, together with such powers as are *reasonably implied from such express powers* and necessary and proper to carry out the objects and purposes of the district." (§ 118-301, italics added.) It also provides: "The district shall have the power by resolution or ordinance to adopt regulations respecting *the exercise of its powers and the carrying out of its purposes*, and to fix and collect rates and charges for the providing or the availability of any service it is authorized to provide or make available or for the sale, lease, or other disposition of water or other product of its works or operations, including standby charges and

8

connection charges." (§ 118-308, italics added.) "[W]orks," as statutorily defined, "includes, but is not limited to, dams and damsites, reservoirs and reservoir sites, and all conduits and other facilities useful in the control, collection, conservation, storage, reclamation, treatment, disposal, diversion, and transmission of water, the collection, treatment, reclamation, or disposal of sewage, waste, or storm waters, and all land, property, franchises, easements, rights-of-way, and privileges necessary or useful to operate, maintain, repair, or replace any of the foregoing." (§ 118-14.)

The District's authority is wide-ranging. The District has power to develop water resources, sell and dispose of water, control flood and storm waters, acquire water systems, restrict water use during emergencies, and authorize improvements to provide additional water during emergencies. (§ 118-325 et seq.) In addition, its authority includes, but is not limited to, ground water management (§ 118-341 et seq.), the construction, maintenance, improvement, and operation of "public recreational facilities appurtenant to any water reservoir operated or contracted to be operated by the agency" and regulation of the Carmel River (§ 118-368 et seq.), development and operation of sewage, industrial waste and storm water facilities (§ 118-371 et seq.), and the acquisition of property, the leasing of real property, and the exercise of eminent domain (§ 118-391 et seq.).

More specifically as to water supply, control and distribution, the District Law states: "The district shall have the power *as limited in this law to do any and every lawful act necessary in order that sufficient water may be available for any present or future beneficial use or uses* of the lands or inhabitants within the district, including, but not limited to, irrigation, domestic, fire protection, municipal, commercial, industrial, recreational, and all other beneficial uses and purposes." (§ 118-325, italics added.) The District has the power to "fix, revise, and collect rates and charges for the services, facilities, or water furnished by it." (§ 118-326, subd. (b).) It has the power to "establish

9

rules and regulations . . . to provide for the sale, distribution, and use of water . . . ." (§ 118-326, subd. (c).)  Its powers also include the power to "conserve and reclaim water for present and future use within the district."  (§ 118-328, subd. (c).)

D.  *Rules Regarding Water Permits*, *Water Use Capacity*, *and Connection Charges*

Since the District's creation, the Board has enacted many ordinances[3] and adopted, amended, or revoked various rules.

Rule 20 provides and, at the time the District issued the Thums' water permit, provided: "Before any Person connects to or modifies a water use Connection to a Water Distribution System regulated by the District . . . , such Person shall obtain a written Permit from the District or the District's delegated agent, as described in District Rules 21, 23 and 24."  (Rule 20-B; see Ord. Nos. 128 & 145.)  A water permit is required for, among other things, "[a]ny modification to, or relocation of, Residential water fixtures" (rule 20-B-3) and "[installation of] new water fixtures . . . in a Residential use" with the exception of replacement of existing water fixtures.  (Rule 20-B-6, see Ord. No. 156, adopted Nov. 18, 2013.)

The District's former rule 24 was adopted by ordinance No. 21 in 1985[4].  That rule established "connection charges" applicable to "the expansion, extension, and increased utilization of any connection or water-measuring device in a potable water distribution system within the District."  (Ord. No. 21, former rule 24-A.)  Ordinance No. 21 was prefaced by District findings, including the finding that "a general positive correlation exists between the number of residential plumbing fixtures and the potential use

---

[3]    As relevant, we cite to the District's ordinances of which we take judicial notice (Evid. Code, §§ 452, subd. (b), 459; see also Evid. Code, § 200) if not included in the appellate record.  All further references to ordinances are to the District's ordinances.

[4]    All further references to specific ordinances are to the ordinances enacted by the District.

(demand) of District potable water supplies resulting from new or intensified development" and "[t]he number of both internal and external water fixtures increases water consumption and system demand." (Ord. No. 21, Finding of Fact No. 9.) Former rule 24 has been amended many times since its adoption.

Rule 24 provides and, at the time the District issued the Thums' water permit, provided: "Residential Water Use Capacity shall be calculated using a fixture unit methodology whereby each water fixture is assigned a fixture unit value that corresponds to its approximate annual Water Use Capacity. Residential applications shall be reviewed to determine if there is an increase in fixture units as a result of the proposed Project."[5] (Rule 24-A; see Ord. No. 145.) As to that calculation, the District's general manager must "estimate Water Use Capacity of the proposed Project using the fixture unit values . . . from Table 1: Residential Fixture Unit Count Values."[6] (Rule 24-A-1-a; see Ord. No. 145.) The general manager must "determine if Project will result in a positive, neutral or reduced Water Use Capacity on the Site." (Rule 24-A-1-e; see Ord. No. 145.) The general manager must "reduce the Estimated Annual Water Use Capacity by any verified Water Use Credit or On-Site Water Credit applicable to the application as shown on the Water Release Form and Water Permit application and shall determine the

---

[5] "Water Use Capacity" or "Capacity" is defined by District rule as "the maximum potential water use which theoretically may occur, based on average water use data for similar structures and uses in the Monterey Peninsula region, as shown by projected water use tables set forth in Rule 24." (Rule 11.)

[6] Rule 24's "Table 1: Residential Fixture Unit Count Values," as amended, presently shows that a standard bathtub and shower may each have one showerhead and additional showerheads, body spray nozzles, other additional fixtures are separately counted. Each of those residential water fixtures has a fixture unit value of "2." (Rule 24, Table 1.) Certain water fixtures are exempt from the residential permit requirements and have no fixture unit value. (Rule 24-A-2.)

11

Adjusted Water Use Capacity of the proposed Project." (Rule 24-A-1-d; see Ord. No. 145.)

Under the District's rule 24, "[a]n increase in Capacity (Intensification of Use) shall cause the calculation and collection of a Connection Charge prior to issuance of a Water Permit."[7] (Rule 24-A-1-e-(1).) As originally adopted and in its present form, the rule established a multiplier, designated the "water supply cost component," to be used in calculating a connection charge. (Rule 24-C; Ord. No. 21 [former rule 24-A-5]) The rule still requires the multiplier to be annually adjusted on July 1 and applied to each residential water permit application. (*Ibid.*) Rule 24's Table 3 shows the annually adjusted multiplier, which has increased every year and more than doubled since 1985. (Rule 24, Table 3.) In 2009-2010, the multiplier was $23,163.01. (*Ibid.*)

Rule 24 states and, at the time the District issued the Thums' water permit, stated: "The Connection Charge paid for a Water Permit shall be determined by multiplying the Adjusted Water Use Capacity by the current Connection Charge. This charge shall be applied to each application for a Water Permit as follows: [¶] 1. Projects served by the Main California American Water Company System and Seaside Municipal Water Company shall pay 100 percent of the final calculation. [¶] 2. All other Water Distribution Systems including private Wells and other Water Distribution Systems owned and/or operated by California American Water Company outside of the main system shall pay 18.67 percent of the final calculation."[8] (Rule 24-D; see Ord. No. 145.)

---

[7]    "No Connection Charge shall be assessed when there is no increase in Water Use Capacity." (Rule 24-A-1-e-(3).) "A reduction in Water Use Capacity shall result in a Water Use Credit upon verification that the former use has been permanently abandoned." (Rule 24-A-1-e-(3).)

[8]    As currently written, the District's Rule 24 confusingly refers to both the charge imposed in connection with issuance of a water permit and the "water supply cost component" as the "Connection Charge."

Rule 24 provides and, at the time the District issued the Thums' water permit, provided: "The Connection Charge paid for a Water Permit under these Rules and Regulations shall be a fee retained by the District in consideration of, and as reimbursement for the costs and expenses incurred by the District in planning for, acquiring, reserving, and maintaining capacity in the water distribution facilities existing or to be constructed within the District." (Rule 24-F-1; see Ord. No. 145.)

Rule 23 governs the water permitting process. It states in part: "Intensification of Use allowed by a Water Permit shall result in a deduction from a Jurisdiction's Allocation (for Projects served by the Main California American Water System), from a Water Entitlement available to the property, or from the total available production limit for that Water Distribution System." (Rule 23-A-1-h.) "Jurisdiction" is defined by the District as "one of the following: (1) Carmel-by-the-Sea, (2) Del Rey Oaks, (3) Monterey City, (4) Monterey County, (5) Monterey Peninsula Airport District, (6) Pacific Grove, (7) Sand City, or (8) Seaside." (Rule 11.)

E. *Appellants' Combined Petition and Complaint*

The Thums' combined petition and complaint contained seven "causes of action." It sought writ relief on "causes of action" one through five. It sought declaratory relief on "causes of action" six and seven.

The first "cause of action" alleged that the respondents' restriction of household water "directly contradicts" the limitation of power established by section 118-332 and claimed that section "states the District does not have authority to restrict household uses of water." The prayer for relief on the first "cause of action" sought a writ of mandate compelling respondents to "not take any actions to restrict household use of water

13

pursuant to section 118-332 and Water Code section 106, remove the deed restriction imposed on [their] property, and . . . fully and completely comply with law."[9]

The second "cause of action" asserted that "section 118-363 does not authorize the District to charge connection fees for changes to the plumbing pipes inside a house or any other property." It further averred that the District violates the "legislative authority expressed in sections 118-363, 118-308 and 118-326(b)" by "charging and collecting connection fees when it has not provided a water connection or furnished services, facilities or water to" them. It alleged that the District "can charge connection fees only after it has actually augmented the established water delivery service." The prayer for relief on the second "cause of action" sought a writ of mandate compelling respondents to "cease charging and collecting connection fees unless and until such actions duly comply with law."

The third "cause of action" alleged that the District's "practice of entering private homes to count and inventory household water fixtures . . . violates the fundamental right to privacy under Article I, section 1 of the California Constitution." The prayer for relief on the third "cause of action" sought a writ of mandate compelling respondents to "cease unlawfully entering residences unless and until any such entry fully complies with the right to privacy granted in Article 1, section 1 of the California Constitution."

The fourth "cause of action" alleged that the District's warrantless inspection of their house was unreasonable because the inspection was overbroad and the Thums' consent was obtained under threat and, therefore, the inspection constituted an unconstitutional government search. The prayer for relief on the fourth "cause of action" sought a writ of mandate compelling respondents to "cease unlawfully entering homes

---

[9] Water Code section 106 provides: "It is hereby declared to be the established policy of this State that the use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation."

14

unless and until any such entry into residences fully complies with Article 1, section 13 of the California Constitution and the Fourth Amendment to the United States Constitution."

The fifth "cause of action" averred that the District's rules using "household water fixtures as a proxy for estimating household water use, but only for those households that have sought a permit" are arbitrary, irrational and capricious. It stated that "it is not clear to the average citizen" what fixtures are counted. It further alleged that the District's "selection of water fixtures as a proxy for estimating water use" and fixture counting methodology violate "the substantive due process rights afforded under Article I, Section 7 of the California Constitution and the Fifth and Fourteenth Amendments to the United States Constitution." The prayer for relief on the fifth "cause of action" sought a writ of mandate compelling respondents to "set aside its residential water fixture counting rules unless and until it is able to adopt rules that rationally relate to estimating residential water use capacity and charging connection fees" and to "fully and completely comply with the law."

The sixth "cause of action" stated that, "[i]n 1996, California voters approved Proposition 218, which amended the California Constitution by adding Articles 13C and 13D . . . ." It alleged that the District's connection charge, calculated under rule 24, was "unlawful because it is a general tax, or, in the alternative, it is a special tax and was not submitted to the voters for their approval." It stated that "[a]n actual controversy now exists between [appellants and respondents] as to the legality of the connection charge imposed under District Rule 24."

The seventh "cause of action" alleged that the "connection charge is unlawful because it exceeds the proportional cost of service attributed to parcels, . . . it is imposed for potential or future services, and is imposed for general government services in violation of [California Constitution,] Article 13D, Section 6(b), or, in the alternative, it is

15

a new or increased property related fee or charge within the meaning of California Constitution Article 13D, Section 6(c) requiring voter approval, which has not been obtained." It stated that "[a]n actual controversy now exists between [appellants and respondents] as to the legality of the connection charge imposed under Rule 24."

The prayer for relief on the sixth and seventh "causes of action" sought a declaration that (1) "the connection charge is a general tax and as such is invalid and illegal," (2) "the connection charge is a special tax" that is "invalid and illegal until such time as it is lawfully approved," (3) "the connection charge is an invalid and illegal fee or charge under California Constitution Article 13D Section 6(b)," or (4) "the connection charge is an invalid and illegal new or increased fee or charge pursuant to California Constitution Article 13D Section 6(c) until such time as it is lawfully approved."

Although the Thums did not expressly request a writ directing the Board to set aside its decision denying their appeal and issue a new decision granting their appeal, they did seek "such other and further relief as the Court deems just and reasonable."

F. *Judgment and Findings*

The trial court entered a judgment in favor of the District. Its judgment included the following findings. The Thums' bathroom addition did not implicate a fundamental vested right and the more deferential standard of review under Code of Civil Procedure section 1094.5 applies. The District's connection charge was validated by a 1986 validation judgment and is proper. The Thums are "barred from challenging the District's water use restrictions pursuant to Water Permit No. 30234 (Permit) because [they] accepted the benefits of the Permit. (*Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459.)" The District "has broad express and implied powers to provide and conserve water, to collect money for services, and to restrict water use during an emergency" and the District did not apply sections 118-301, 118-308, 118-325, 118-326, 118-332, 118-363, and 118-371 "in an arbitrary or

16

irrational manner." "The number of water fixtures used by the District to determine charges reasonably relates to a proper legislative goal," "the rules of the District, in conformity with the enabling legislation, conserve and provide water to the Monterey Peninsula and are not unreasonable, arbitrary or capricious," and the "[a]llocation of water based on the numbers and types of fixtures for a property has a real and substantial relation to the object sought to be attained, i.e., water conservation."

The trial court denied writ relief. It also "denied" declaratory relief on mootness grounds.

## II

### *Writ of Mandate*

A. *Asserted Bars to Relief*

1. *Promissory Estoppel*

As indicated, relying upon the authority of *Tahoe Keys*, *supra*, 23 Cal.App.4th 1459 (*Tahoe Keys*), the trial court determined that petitioners were "barred from challenging the District's water use restrictions pursuant to Water Permit No. 30234 (Permit) because [they] accepted the benefits of the Permit." It indicated the steps taken by them: submitting an application to convert a storage area to a bathroom, recording a deed restriction, paying a connection charge, agreeing to an inspection, obtaining a building permit, and proceeding with bathroom construction.

Impliedly based upon the foregoing judicial determination, the Thums now argue that the trial court incorrectly concluded that they did not exhaust their administrative remedies. They assert that they were not required "to appeal from the bathroom permit to preserve their challenge to the fixture permit," which was a separate issue that they "timely challenged [] when it arose."

In *Tahoe Keys*, the Court of Appeal, Third District, stated: "A landowner or his successor in title is barred from challenging a condition imposed in a land-use regulation

17

if he has acquiesced therein by either specifically agreeing to the condition or by failing to challenge its validity while accepting the benefits afforded.  (*County of Imperial v. McDougal* (1977) 19 Cal.3d 505, 510-511 . . . ; *Edmonds v. County of Los Angeles* (1953) 40 Cal.2d 642, 650 . . . ; *J-Marion Co. v. County of Sacramento* (1977) 76 Cal.App.3d 517, 523 . . . ; *Pfeiffer v. City of La Mesa* (1977) 69 Cal.App.3d 74, 78 . . . .)" (*Tahoe Keys*, *supra*, 23 Cal.App.4th at p. 1484.)  *Tahoe Keys* is not an exhaustion of administrative remedies case.  (*Id*. at pp. 1469-1470, fn. 6.)  The rule to which it refers is a form of estoppel.

In *County of Imperial v. McDougal* (1977) 19 Cal.3d 505 (*McDougal*), one of the cases cited in *Tahoe Keys*, a property owner obtained "a use permit to allow commercial sales of water from a well on [his] property, which was located in a residential subdivision." (*Id.* at p. 507.)  "The permit contained a limitation that water could be sold for use only within the county." (*Ibid*.)  The permit ran with the land, and when McDougal purchased the property, he "succeeded to any benefits" of the permit.  (*Id*. at p. 510.)  After buying the property, McDougal "proceeded to substantially increase the volume of sales of water from the well" and he did not comply with the permit limitation "against the sale of water for use outside the county, and much of the water from the well was sold for distribution in Mexico." (*Id*. at pp. 507-508.)

On review of *McDougal*, the Supreme Court stated: "A number of cases have held that a landowner or his successor in title is barred from challenging a condition imposed upon the granting of a special permit if he has acquiesced therein by either specifically agreeing to the condition or failing to challenge its validity, and accepted the benefits afforded by the permit.  [Citations.]  Thus, McDougal is estopped to assert that the prohibition in the [prior owner's] permit against the sale of water for use outside the county is invalid, and he is bound by the limitation." (*McDougal*, *supra*, 19 Cal.3d at pp. 510-511, fn. omitted.)

18

In *Edmonds v. County of Los Angeles* (1953) 40 Cal.2d 642 (*Edmonds*), another case cited in *Tahoe Keys*, the plaintiffs "maintained a trailer court for 20 trailers on their property, consisting of five lots in an area zoned as C-3, wherein trailer courts were permitted." (*Id.* at p. 644.) After the property was rezoned for residential use, they lawfully continued the preexisting, nonconforming use but then they unlawfully expanded the number of trailers in violation of the local zoning ordinance. (*Ibid.*) They eventually secured a conditional exception to the ordinance requiring them to "abandon the entire nonconforming use of their property for trailer court purposes at the end of three years." (*Id*. at p. 645.) The Supreme Court stated: "For a period of three years plaintiffs made a use of their property to which they were not entitled under the law in the absence of the granting of the conditional exception. By their conduct they led everyone to believe that the exception had been accepted. Plaintiffs made an oral promise on which defendants relied to their detriment, and justice can be done only by the enforcement of the promise. The situation presented is therefore the ordinary one of promissory estoppel. [Citations.]"[10] (*Id*. at p. 653.)

Thus, it is clear under California law that "[a] landowner cannot challenge a condition imposed upon the granting of a permit after acquiescence in the condition by either specifically agreeing to the condition or failing to challenge its validity, and accepting the benefits afforded by the permit. ([*McDougal*, *supra*,] 19 Cal.3d [at pp.] 510-511 . . . .)" (*Rossco Holdings Inc*. *v*. *State of California* (1989) 212 Cal.App.3d 642, 654.)

---

[10]    "In California, under the doctrine of promissory estoppel, '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.' [Citations.]" (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310.)

19

The Thums present no argument that, under the foregoing principles, they were not barred from challenging the deed restrictions to which they agreed in obtaining the water permit nor have they cited any legal authority to support such argument. " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) Accordingly, their challenge to the trial court's determination pursuant to *Tahoe Keys* is deemed waived.

2. *Doctrine of Exhaustion of Administrative Remedies*

Respondents' answer to the Thums' petition and complaint asserted the affirmative defense that appellants failed to exhaust administrative remedies.[11] Even though both sides mention the exhaustion doctrine on appeal, the trial court did not resolve that issue in its statement of decision or judgment.

In this appeal, the issue of whether the Thums failed to exhaust their administrative remedies is not before us. (See *Ventura v. ABM Industries Inc.* (2012) 212 Cal.App.4th 258, 265 [defendants waived defense raised in answer by not seeking ruling

---

[11] The District's Rule 70 provided in part: "Determinations of the General Manager or the District Engineer may be appealed to the District Board, in writing, within twenty-one (21) days after any such determination. Such appeal shall specify in writing the grounds upon which it is taken, and shall reference the provision of these Rules and Regulations which have been violated . . . ." After the Thums' final inspection, the District reminded the Thums of that deadline by letter. The Thums filed their administrative appeal more than 21 days after that inspection. In addition, after the time for initiating an appeal had passed, they expanded their arguments. Respondents did not assert, however, that the Thums forfeited any of their legal arguments by failing to raise them in a timely appeal from the determination of noncompliance following inspection. Rather, their argument was that the Thums "did not exhaust their administrative remedies because they did not object to the Water District's powers and rules before accepting the permit and deed restriction and building the bathroom."

20

on it]; *Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439 [nonappealing respondent may not urge error on appeal], see also Code Civ. Proc., §§ 906 [matters reviewable on appeal], and 634 ["When a statement of decision does not resolve a controverted issue, . . . it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party . . . on that issue."].)

3. *1986 Validation Judgment*

Relying on the 1986 validation judgment validating the District's ordinance No. 21, which adopted former rule 24, the trial court concluded that the District's connection charges are proper.

In 1986, the Monterey County Superior Court issued a judgment validating the District's ordinance No. 21, which was adopted on March 11, 1985. That judgment states: "Ordinance 21 of the [MPWMD], together with the connection fees promulgated therein, is determined to be a valid, correct and lawful ordinance. The connection charges imposed by . . . Ordinance 21 constitute neither a tax nor an assessment, but impose a valid user fee fashioned upon a reasonable nexus between the amount of the charge, and the capacity for water service for which the user has a beneficial interest."

Section 118-412 provides: "Any action to determine the validity of any contract, any bonds, notes, or other evidences of indebtedness, or the levy of a special assessment shall be brought pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure."[12] Code of Civil Procedure section 860 et seq. was added by statute in 1961. (Stats. 1961, ch. 1479, § 1, pp. 3331-3332.)

_____

[12] Appellants point out that section 118-412 authorizes validation proceedings only in specific instances, including "the levy of a special assessment." Insofar as they may be attempting to collaterally attack the validation judgment, we observe the general rule that "a final judgment or order is res judicata even though contrary to statute where the court has jurisdiction in the fundamental sense, i. e., of the subject matter and the parties." (*Pacific Mut. Life Ins. Co. of Cal. v. McConnell* (1955) 44 Cal.2d 715, 725.) Appellants (continued)

"By 1961, the California codes contained a patchwork of provisions governing validation proceedings, with each set of provisions dedicated to a different statutory scheme. In that year, the Legislature sought to replace this patchwork with a general validation procedure. (Stats. 1961, ch. 1479, §§ 1-3, pp. 3331-3332.) This procedure, which the Legislature codified as Code of Civil Procedure sections 860 through 870, does not, in itself, authorize any validation actions; rather, it establishes a uniform system that other statutory schemes must activate by reference." (*Bonander v. Town of Tiburon* (2009) 46 Cal.4th 646, 656.)

Code of Civil Procedure section 860 provides: "A public agency may upon the existence of any matter which under any other law is authorized to be determined pursuant to this chapter, and for 60 days thereafter, bring an action in the superior court of the county in which the principal office of the public agency is located to determine the validity of such matter. The action shall be in the nature of a proceeding in rem." "If no proceedings have been brought by the public agency pursuant to this chapter [Code Civ. Proc., § 860 et seq.], any interested person may bring an action within the time and in the court specified by Section 860 to determine the validity of such matter."[13] (*Id.*, § 863.)

"The judgment in a proceeding brought under the general validation procedure is 'binding and conclusive . . . against the agency *and against all other persons . . . .*' (Code Civ. Proc., § 870, subd. (a), italics added.) Because the proceeding is in the nature of an

have not argued that the superior court lacked subject matter jurisdiction to render the 1986 validation judgment.

[13]    The validation proceeding concerning the District's ordinance No. 21 was initiated by a private party pursuant to Code of Civil Procedure section 863 but the superior court converted the proceeding to an in rem proceeding brought by the District pursuant to Code of Civil Procedure section 860 after it dismissed the other parties pursuant to stipulation.

action against the entire world, '[j]urisdiction of all interested parties may be had by [newspaper] publication of summons . . .' and such other notice as the court may order. (*Id*., § 861.)" (*Bonander v. Town of Tiburon*, *supra*, 46 Cal.4th at p. 656.)

"A key objective of a validation action is to limit the extent to which delay due to litigation may impair a public agency's ability to operate financially. (*Graydon v. Pasadena Redevelopment Agency* (1980) 104 Cal.App.3d 631, 644-645 . . . .) A validation action fulfills a second important objective, which is to facilitate a public agency's financial transactions with third parties by quickly affirming their legality." (*Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 843.) " 'The text of section 870 and cases which have interpreted the validation statutes have placed great importance on the need for a single dispositive final judgment.' (*Committee for Responsible Planning v. City of Indian Wells* (1990) 225 Cal.App.3d 191, 197-198 . . . .) The validating statutes should be construed so as to uphold their purpose, i.e., 'the acting agency's need to settle promptly all questions about the validity of its action.' (*Millbrae School Dist. v. Superior Court* [1989] 209 Cal.App.3d [1494,] 1499 . . . .)" (*Id*. at p. 842.)

Under Code of Civil Procedure section 870, subdivision (a), a validation judgment is "binding and conclusive" as to "all matters therein adjudicated or which *at that time could have been adjudicated . . . .*" (Italics added.) The interpretation or effect of a validation judgment presents a question of law for the reviewing court. (See *John Siebel Associates v. Keele* (1986) 188 Cal.App.3d 560, 565.)

The Thums insist that the validation judgment does not bar the present challenges to the connection charges because the judgment was limited to validating a "bond financing plan for a $34 million dam that was never built." This assertion is simply incorrect. The judgment itself did not validate any bond financing plan. Rather, it clearly adjudicated that ordinance No. 21 is valid, correct, and lawful. Moreover, the rule

23

adopted by the ordinance did not limit the use of collected connection charges to the financing of a particular water supply project.

In enacting ordinance No. 21, the Board made many findings supporting the adoption of former rule 24. The Board found, among other facts, that "a general positive correlation exists between the number of residential plumbing fixtures and the potential use (demand) of District potable water supplies resulting from new or intensified development." (Ord. 21, Finding No. 9.) The Board found: "The [District] is presently planning a water supply project with an estimated cost of approximately $34,000,000.00" and its financing cost could exceed $172,000,000. (Ord. No. 21, Finding No. 13.) It further found that those "long-term costs of this water supply project can be substantially reduced by creation of a sinking fund to pre-pay a portion of the project construction costs." (*Ibid*.) In addition, the Board specifically found: "The [District] cannot fully fund its management, monitoring, augmentation and river restoration programs from general fund revenues to fully discharge, in a timely manner, the duties delegated by the California Legislature, and to fulfill the current needs of District water distribution systems and their water consumers." (Ord. No. 21, Finding No. 23.)

Former rule 24, as adopted in ordinance No. 21, required the District to place 18.67 percent of the collected connection charges in a separate account "A" in its general fund and to place 81.33 percent of the collected connection charges in a separate account "B" in its general fund. (Ord. No. 21 [former rule 24-11].) The former rule prohibited the District from expending the funds maintained in account "B" "prior to the final discretionary approval of a water supply project, including, if necessary for the project, a vote of the people." (Ord. No. 21 [former rule 24-11].) As the Thums point out, rule 24 no longer contains that prohibition. (See Ord. No. 34 [adopted May 9, 1988].)

The deletion of the prohibition with respect to the funds in account "B" did not change "the sole purpose" of all the "connection charge" funds, which remains to this day

24

the "planning for, acquiring, and/or reserving augmented water supply capacity for District water distribution facilities." (Rule 24-G-2; see Ord. No. 21 [former rule 24-A-11].) Those purposes still encompass "engineering, hydrologic, geologic, fishery, appraisal, financial, and property acquisition endeavors." (*Ibid*.) Those funds may still be "used to acquire, maintain, and/or reserve capacity in existing water distribution facilities existing within the District." (*Ibid*.) Contrary to the Thums' claim, the purpose of connection charge funds has not materially changed.

The Thums also argue that material modifications to rule 24 extinguished any res judicata protection provided by the 1986 validation judgment. Although the Thums have pointed out significant changes to rule 24 subsequent to the enactment of ordinance No. 21, they have not shown that their central contention, that the District has no statutory authority whatsoever to impose any charge for adding a residential water fixture, could not have been adjudicated in the validation proceeding. We reiterate that a validation judgment conclusively resolves "all matters therein adjudicated or which at that time could have been adjudicated . . . ." (Code Civ. Proc., § 870, subd. (a).)

Further, the essential premise of the rule has not changed. Former rule 24, as adopted by ordinance No. 21, provided that "[t]he addition of any fixture unit by a user shall be deemed an intensification of use requiring an expansion/extension permit, or an amended permit pursuant to these Rules and Regulations." (Ord. No. 21 [former rule 24-A-1].) It required the District's general manager to determine the "fixture unit count," using a table assigning "fixture unit value" to particular fixtures, for an applicant's anticipated intensification of residential water use facilitated by additional fixtures. (Ord. No. 21 [former rule 24-A-3].) It further provided that "[t]he connection charge for intensification of use from an existing connection shall exact a charge only as it relates to the extra increment of water which will be available to and subject to use by the applicant as the function of the relocated, increased, or altered use from the

25

connection." (Ord. No.21 [former rule 24-A-2].) The Thums incorrectly suggest that former rule 24 only applied to a "new water connection."

Former rule 24, as adopted by ordinance No. 21, established a formula for calculating the residential "connection charge" imposed upon an applicant for a water permit. The formula involved a number of variables, including the number of fixtures, the fixture unit value assigned to particular fixtures, the water supply cost component multiplier, and a multiplier dependent upon the particular water distribution system that serviced the residence. (Ord. No. 21 [former rule 24-A-3, A-5, A-6].)

Like former rule 24, rule 24 requires the general manager to determine the number of additional fixture units and their fixture unit values. (Rule 24-A.) The calculation of the "connection charge" under rule 24 still involves assignment of fixture unit values to water fixtures and the use of a "water supply cost component" multiplier. Instead of requiring an initial calculation of an "unfactored connection charge,"[14] however, rule 24 now requires the calculation of the residential "adjusted water use capacity, "[15] which is then multiplied "by the current Connection Charge [water supply cost component]." (Rule 24-A-6 & D.)

Although the District may have altered the formula for calculating the "connection charge" imposed upon a residential water user, the Thums are not challenging those changes. Rather, the Thums seek to challenge the District's authority under the District Law to impose any charge at all. This issue was impliedly determined against them by the validation judgment because it was an issue that "at that time could have been

---

[14]     Former rule 24, as adopted by ordinance No. 21, set forth the formula for determining the "unfactored connection charge" as follows for the first 10 residential fixture units per dwelling unit: "# of dwelling units x # of fixture unit count x water supply cost/200." (Ord. No. 21 [former rule 24-A-3-C].)
[15]     Each fixture unit has "a value of 0.01 Acre-Foot of water." (Rule 24-A-6-a.) "Water use calculations" must be "rounded to the third decimal place." (Rule 24-A-6-b.)

26

adjudicated . . . ." (Code Civ. Proc., § 870, subd. (a).) Appellant have not shown that a finding made in enacting ordinance No. 98, indicating that the District is "mindful that people, not fixtures, use water," has any effect on this conclusion.[16]

The effect of the validation judgment on the Thums' requests for declaratory relief will be separately addressed below.

B. *Scope of Statutory Authority*

We next examine the Thums' claims regarding the extent of the District's statutory authority under the District Law. The interpretation of a statute is a question of law that we review de novo. (See *Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724; *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699.)

1. *Statutory Authority to Regulate Household Water Use Capacity*

a. *Section 118-363*

The Thums maintain that the District has limited powers and it "was created to focus on managing the *supply* of water—not the *use* of water." They assert that "[t]he responsibility for conserving and encouraging efficient use of water primarily rests with the utility, Cal-Am."

Respondents maintain that the District Law allows the District "to regulate both nonessential water use during an emergency, and to regulate water use in general." They imply that their statutory authority to adopt a water permitting process arises from section 118-363. The Thums counter that, under section 118-363, the District's power to regulate access to a water supply "ends at the meter."

---

[16]     District ordinance No. 98 extended "the 'special circumstance' treatment afforded to water using fixtures in a residential master bath to the addition of a second bathroom in any existing residence." (Ord. No. 98, Finding No. 4.)

In its brief, the District incompletely quotes section 118-363, which provides: "No person, owner, or operator shall establish, extend, expand, or create a water distribution system unless and until the approval of the board is first obtained in writing. *For the purposes of such approval*, *the board may adopt such rules and regulations and establish such forms for such applications as are necessary and proper.* The board may provide by ordinance for exceptions to the requirement for approval for systems furnishing domestic water to three or fewer parcels or lots in the district." (§ 118-363, italics added.) The Thums assert that their fixtures are not water distribution systems.

Section 118-363 is contained in the District Law's part 4, chapter 2, article 2, which is entitled "Ground Water Management." The article's first provision states: "The district shall encourage the coordination and integration of ground water supplies with surface water supplies and for such purposes shall have the additional powers provided in this article." (§ 118-341.) The District is provided with the authority "to levy and collect a ground water charge for the production of water from the ground water supplies . . . ." (§ 118-343; see §§ 118-343.5 to 118-345.) The use of proceeds of ground water charges may be used for only specified purposes, including paying "the costs of constructing, maintaining, and operating facilities" to import water or to conserve or distribute water within established ground water charge zones (§ 118-346, subd. (a)) and paying "the costs of purchasing water for importation" into such zones. (§ 118-346, subd. (b); see § 118-344.) Water-producing facilities within such zones must register with the District. (§ 118-347; see § 118-348 & § 118-349.) Section 118-360 makes it unlawful to produce water from any unregistered water-producing facility. (§ 118-360.) Section 118-362 gives the District the additional powers, including the power to "install and maintain water-measuring devices, and other devices which will aid in determining accurate water production, on water-producing facilities not owned by the district" (§ 118-362,

28

subd. (a).) and to "enter on to any land for the purposes enumerated in this section and for the purpose of making investigations relating to water production" (§ 118-362, subd. (c).)

As indicated, section 118-363 provides that the creation or expansion of a water distribution system requires the District's written approval and specifically authorizes the District to adopt regulations governing that approval. This statutory provision cannot be reasonably read as providing plenary authority to enact rules concerning the addition of residential water fixtures in order to regulate a household's capacity to use water.

Citing *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 (*Yamaha*), the District asserts that it is "entitled to great deference in interpreting its own Rules and Ordinances." It may be true that " '[a] court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' [Citation.]" (*Id*. at p. 12.) It must be kept in mind, however, that "even quasi-legislative rules are reviewed independently for consistency with controlling law." (*Id*. at p. 11, fn. 4.) "A court does not . . . defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature. The court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued. [Citations.]" (*Ibid*.) "[T]here is no agency discretion to promulgate a regulation which is inconsistent with the governing statute." (*Woods v. Superior Court* (1981) 28 Cal.3d 668, 679.)

Generally, when construing a statute, a court "first examines the statute's words, giving them their ordinary and usual meaning and viewing them in their statutory context, because the statutory language is usually the most reliable indicator of legislative intent. [Citations.]" (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567.) The word "distribution" may be defined as the "delivery or conveyance (as of . . . goods) to

29

the member of a group," such as customers.  (Webster's 3d New Internat. Dict. (1993) p. 660.)  The word "system" may be defined as "a group of devices or artificial objects forming a network or used for a common purpose."  (*Id*. at p. 2322.)  Thus, a "water distribution system," as commonly understood, does not refer to the customer's use of, or capacity to use, water delivered to a residence.[17]

Even under the District's own rules, a water distribution system does not encompass a residential customer's use of, or capacity to use, water delivered to a home.  " 'Water Distribution System' means all works within the District used for the collection, storage, transmission or distribution of water from the Source of Supply to the Connection of a system providing water service to any Connection . . . ."  (Rule 11.)  "Connection" is generally defined by District rule to mean "the point of intersection where a User gains access to the Water Distribution System."  (Rule 11.)  "User" is defined by District rule to mean "a customer or consumer of water delivered by a Water Distribution System" and "[u]ser" "does not include any Owner or Operator of a Water Distribution System."  (Rule 11.)

We agree that the addition of residential water fixtures does not extend or expand "a water distribution system" within the meaning of section 118-363.  The fact that the District broadly defines "water distribution system" to also include the user's piping when there is no water meter at the point of connection (see rule 11) does not mean that section 118-363 authorizes the District to regulate water fixtures in the home as a means of limiting residential water use capacity.  The authority granted in section 118-363 does not encompass the power to regulate residential water fixtures.

---

[17]     For example, the Legislature has elsewhere defined the phrase "water distribution system" to mean "any combination of pipes, tanks, pumps, and other physical features that deliver water from the source or water treatment plant to the consumer."  (Health & Saf. Code, § 116275, subd. (y).)

Even assuming conservation of water by residential consumers is an important component of sound, comprehensive management of water resources, we conclude that the District's authority to regulate water fixtures in the home must be derived from a different statutory source than section 118-363.

b. *Section 118-325*

Respondents indicate that section 118-325 provides its statutory authority to limit water use. The Thums basically argue that the District Law empowered District to conserve and augment the available water supply but it did not authorize the District to regulate the residents' use of water after delivery to a home.

"Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment." (*Coalition of Concerned Communities*, *Inc*. *v*. *City of Los Angeles* (2004) 34 Cal.4th 733, 737.) "[W]e construe the words in question in context, keeping in mind the statute's nature and obvious purposes. [Citation.]" (*Los Angeles County Metropolitan Transp*. *Authority v*. *Alameda Produce Market*, *LLC* (2011) 52 Cal.4th 1100, 1107.) "If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history. [Citation.]" (*Ibid*.)

Under section 118-325, the District has the express "power as limited in this law to do *any and every lawful act* necessary in order that sufficient water may be available for any present or future beneficial use or uses of the lands or inhabitants within the district . . . ." (§ 118-325, italics added.) Further, the District has been given the express power to "conserve and reclaim water for present and future use within the district."

31

(§ 118-328, subd. (c).) The district may also exercise the powers that "are reasonably implied from such express powers and necessary and proper to carry out the objects and purposes of the district." (§ 118-301.)

"All powers, privileges, and duties vested in or imposed on the district shall, except as otherwise provided, be performed by and through the board of directors." (§ 118-201.) The Legislative has conferred the power upon the Board to regulate: "The board may by ordinance adopt reasonable rules and regulations to carry out its powers and duties not inconsistent with this or any other law, and may amend, suspend, or repeal such rules and regulations at pleasure."[18] (§ 118-256.)

The Legislature granted the District very broad power under the foregoing provisions. It is our conclusion that, unless otherwise statutorily limited, the District may adopt rules to regulate residential water use capacity to ensure the availability of sufficient water for all present and future beneficial uses. (§ 118-325.) Our conclusion is not undermined by the Thums' claims regarding the District Law's limited objectives.

It is true that regulation of household water use capacity was not a primary purpose of enacting the District Law. Nevertheless, the Legislature envisioned the District as the entity providing comprehensive water management for the Monterey Peninsula area and recognized the District's conservation objectives. (See § 118-2; see also Office of Planning and Research, Enrolled Bill Rep. on Assem. Bill No. 1329 (1977-1978 Reg. Sess.) Aug. 24, 1977, p. 1; Cal. Dept. of Water Resources, Enrolled Bill Rep. on Assem. Bill No. 1329 (1977-1978 Reg. Sess.) Aug. 24, 1977, p. 1.) The Legislature intended the District to provide integrated management of water in the Monterey Peninsula area due to existing water problems and a shortage of water

---

[18] Section 118-256 also provides: "A violation of a district ordinance is a misdemeanor, which offense is subject to the provisions of subdivision (d) of Section 17 of the Penal Code." (§ 118-256.)

resources.  (See § 118-2; Cal. Dept. of Water Resources, Enrolled Bill Rep. on Assem. Bill No. 1329 (1977-1978 Reg. Sess.) Aug. 24, 1977, p. 1.)  It intended the District to have multiple functions, including "management and regulation" of "the use" and "conservation of water."  (§ 118-2.)

As described, the District Law granted very broad powers to the District.  An Enrolled Bill Report explained the background of the bill enacting the law: "A private company, the California-American Water Company, presently controls the production, distribution, and the sale of water in the area.  Although 'CalAm' is regulated by the Public Utilities Commission, there is no public agency to manage water resources or regulate water use. . . .  AB 1329 would create a public agency with extensive powers to regulate water use in the Carmel River basin and Monterey Peninsula areas."[19]  (Office of Planning and Research, Enrolled Bill Rep. on Assem. Bill No. 1329 (1977-1978 Reg. Sess.) Aug. 24, 1977, p. 3.)

Focusing on the statutory phrase "as limited in this law" in section 118-325, the Thums suggest the District's authority there under is restricted to the statutory powers granted elsewhere in the District Law.  This interpretation would render that section entirely superfluous.  "The rules of statutory construction direct us to avoid, if possible, interpretations that render a part of a statute surplusage.  [Citations.]"  (*People v. Cole* (2006) 38 Cal.4th 964, 980-981.)

---

[19]     "In 1995, the State Water Resources Control Board issued Order No. 95-10 . . . . Order No. 95-10 found that the California-American Water Company (Cal Am), which was the principal supplier of water to the Monterey Peninsula, had diverted excess water from the Carmel River basin 'without a valid basis of right,' causing environmental harm. Cal Am was ordered to substantially limit its diversions, to mitigate the environmental effects of its excess usage and to develop a plan for obtaining water legally."  (*Save our Peninsula Committee v. Monterey County Board of Supervisors* (2001) 87 Cal.App.4th 99, 108.)

We have concluded that the grant of power described in section 118-325 is very broad except as circumscribed by any specific limitation in the District Law. The Thums maintain that section 118-332 is such a limitation and it precludes regulation of household water fixtures. We disagree.

c. *Section 118-332*

Section 118-332 provides: "Upon notice, hearing, and by ordinance duly adopted by the board, the district may restrict the use of district water during any emergency caused by drought, or other threatened or existing water shortage, and to prohibit the wastage of district water, or the use of district water during such periods, *for any purpose other than household uses or such other restricted uses as may be determined to be necessary by the board.* During such periods the district may prohibit the use of district water for specific uses which the district may from time to time find to be nonessential. Every ordinance adopted pursuant to this section shall be published pursuant to Section 6061 of the Government Code within 10 days after adoption in a newspaper of general circulation in the district published in the county." (Italics added.)

The Thums interpret section 118-332 as precluding the District from regulating household uses of water in any way. We understand section 118-332 to be an explicit grant of power in times of water emergency. The qualifying phrase at the end of the section's first sentence most reasonably applies to the antecedent verb "prohibit" whose object is "the use of district water." (See § 118-332.) Read in context, it makes clear that the District cannot entirely prohibit certain uses of district water.

The qualifying phrase may not be reasonably read as prohibiting the District from adopting rules regulating residential water use capacity under section 118-325. The Legislature clearly knew how to restrict the District's authority. (See, e.g., § 118-311 [hydroelectric power generated by the District's plants "shall not be offered for sale

34

directly by the district . . .”]; § 118-376 [“The district shall not . . .”]; § 118-397 [“the district shall not have the power to . . .”]; § 118-438 [“the district shall not impose . . .”].)

We are mindful that “courts must avoid statutory constructions that lead to illogical or absurd results.” (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 142.) The District was created for the very purpose of providing comprehensive and integrated management of water in an area that had already experienced serious water shortage problems. (See § 118-2.) “ ‘Where a statute is theoretically capable of more than one construction [a court must] choose that which most comports with the intent of the Legislature.’ (*California Mfrs. Assn. v. Public Utilities Com.* [1979] 24 Cal.3d 836, 844 . . . .)” (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 681.) Given the District’s broad powers and purposes, we find it unreasonable to conclude that section 118-332 prevents the District from regulating residential water use capacity under its authority “to do any and every lawful act necessary in order that sufficient water may be available for any present or future beneficial use or uses of the lands or inhabitants within the district.” (§ 118-325.)

2. *Connection Charges*

The trial court determined that the “District has broad express and implied powers to,” among other things, “collect money for services . . . .” The Thums assert that the imposition of connection charges before the District furnishes water services violates sections 118-308 and 118-326, subdivision (b).[20] They insist that a “connection charge”

---

[20] The District has “the power by resolution or ordinance to adopt regulations respecting the exercise of its powers and the carrying out of its purposes, and to fix and collect rates and charges for the providing or the availability of any service it is authorized to provide or make available or for the sale, lease, or other disposition of water or other product of its works or operations, including standby charges and connection charges.” (§ 118-308.) As indicated above, the District has the power to “fix, (continued)

35

is "a fee for connecting a user to a utility's facilities" and the District has no authority to impose connection charges for additional residential water fixtures.

The broad statutory language of the District Law empowers the District to fix and collect charges for any of its services, not just for supplying water. (See §§ 118-308, 118-326, subd. (b).) As indicated, the District defines a "connection charge" to mean " a fee retained by the District in consideration of, and as reimbursement for the costs and expenses incurred by the District in planning for, acquiring, reserving, and maintaining capacity in the water distribution facilities existing or to be constructed within the District." (Rules 11 & 24-F-1.) Even though the charge is denominated a "connection charge" by the District, it is not a charge for initially connecting to a water distribution system.

Perhaps, the District should have given a "connection charge" a different name but that does not mean that the District exceeds its statutory authority under the District Law by imposing such charges. In fact, the District's rules now recognize that the term "capacity fee" and "connection charge" are synonymous: " 'Capacity Fee' shall mean a fee retained by the District in consideration of, and as reimbursement for the costs and expenses incurred by the District in planning for, acquiring, reserving, and maintaining capacity in the water distribution facilities existing or to be constructed within the District. . . . The term 'Capacity Fee' shall have the same meaning as the term 'Connection Charge.' "[21] (Rule 11, as added by Ord. No. 157 (adopted Dec. 9, 2013), italics omitted.)

---

revise, and collect rates and charges for the services, facilities, or water furnished by it." (§ 118-326, subd. (b).)

[21] We are aware that Government Code section 66013, subdivision (a), a part of the Mitigation Fee Act (see Gov. Code, § 66000.5, subd. (a)), provides: "Notwithstanding any other provision of law, when a local agency imposes fees for water connections or sewer connections, or imposes capacity charges, those fees or charges shall not exceed (continued)

36

The District's authority under the District Law to collect charges for services is not narrowly restricted to charges for furnishing water or connecting to a water distribution system. Broadly speaking, the District's services include "planning for, acquiring, reserving, and maintaining capacity in the water distribution facilities existing or to be constructed within the District." (Rules 11 & 24-F-1.)

3. *Water Permit Inspections*

District Rules require a final inspection following completion of project under a water permit and authorize the District's "General Manager, or his designee," to "obtain an inspection warrant in accord with the Code of Civil Procedure, Section 1822.50 et seq." and to "conduct such inspections as are necessary to enforce these Rules and Regulations." (Rules 23-A-1-o [final inspection]; 110-A [inspection warrant].)

The Thums assert, as they did below, that the District's water permit inspections violate the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution.[22] The trial court did not resolve those constitutional

---

the estimated reasonable cost of providing the service for which the fee or charge is imposed, unless a question regarding the amount of the fee or charge imposed in excess of the estimated reasonable cost of providing the services or materials is submitted to, and approved by, a popular vote of two-thirds of those electors voting on the issue." (See Gov. Code, §§ 66013, subd. (b), 66017.) Although appellants mention the Mitigation Fee Act, this appeal does not present any challenge to the District's connection charges under that act.

[22] The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." California Constitution, article I, section 13 provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."

issues. It did find, however, that the Thums "agreed to the District's inspection" and their "rights under Article I, section 1, of the California Constitution were not violated."[23] Respondents contend that "the trial court's determination regarding the Thums' consent to the inspection effectively moots the Thums' argument."

The Thums now "admit that as a condition of the January 2010 permit they allowed the District to perform a final inspection of the new bathroom, but they assert their consent was limited to the new bath—they did not freely consent to an inspection of their entire house as a condition of the January 2010 permit." They also assert that any further consent to inspection will be involuntary because it will be given under threat of penalty. They also assert that the District lacks statutory authority to inspect homes or to obtain a warrant to do so.

The administrative record before us does not contain evidence that the Thums were coerced into consenting to an inspection to verify permit compliance or that their consent applied only to inspection of the new bathroom.[24] Rather, the water permit obtained by the Thums specified the number of post-project fixtures in their residence and stated that a final inspection was required. Instead of challenging that inspection requirement, the Thums accepted the permit and proceeded with the bathroom addition and objected to the District's inspection only after the fact. The record does not demonstrate that the Thums' consent to inspection was coerced and, therefore, involuntary.

---

[23] Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

[24] Under District rule 70, "the appellant and/or Applicant and other Persons may present evidence concerning the appeal" at the hearing on the appeal.

We find it unnecessary to resolve the Thums' statutory and constitutional claims that the District has no right to conduct residential inspections to confirm permit compliance or to obtain a warrant upon refusal of consent. "The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." (*Mills v. Green* (1895) 159 U.S. 651, 653 [16 S.Ct. 132]; see *Consolidated Vultee Air. Corp. v. United Automobile* (1946) 27 Cal.2d 859, 863.) "As a general rule, courts will not reach constitutional questions 'unless absolutely necessary to a disposition' of the case before them [citation] . . . ." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 233.)

III

*Declaratory Relief*

After denying the petition for writ of mandate, the court "denied" the complaint for declaratory relief as moot, impliedly in light of its determination regarding the effect of the validation judgment. A validation judgment, however, is not conclusive as to an issue that was not and could *not* have been adjudicated in the proceeding. (Code Civ. Proc., § 870, subd. (a).)

The validation judgment conclusively resolved that connection charges did not constitute a tax or an assessment under then-existing law. In entering that judgment, the superior court could not have adjudicated whether the District's current connection charges violate California Constitution, article XIII C or article XIII D since those articles were only added to this state's Constitution by initiative measure in November 1996, more than a decade after the validation judgment. Further, since the enactment of ordinance No. 21, the "water supply cost component" multiplier used to calculate the charge has steadily increased and, in 2009-2010, it was $23,163, having more than

39

double since 1985. As indicated, the District's formula for calculating connection charges has substantially changed. The validation judgment did not conclusively resolve the Thums' claim the District's current connection charges are invalid as special taxes or new or increased fees or charges under article XIII C or article XIII D. (See Code Civ. Proc., § 870.)

Further, it is not evident from the record before us that the Thums' complaint for declaratory relief is now necessarily moot. Two of the Thums' options for remedying the permit violation require them to pay for an additional water permit, which presumably means paying an additional "connection charge." We express no opinion regarding the merits of their complaint for declaratory relief.

DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings with respect to the Thums' complaint for declaratory relief. The parties shall bear their own costs on appeal.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

MIHARA, J.